**ROMAN CERAMICS CORPORATION, Appellant,**

v.

**PEOPLES NATIONAL BANK, Appellee.**

**No. 82–3200.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) on Oct. 29, 1982.

Decided Aug. 8, 1983.

Rehearing Denied Sept. 2, 1983.

---

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant.

George E. Christianson, Christianson & Meyer, Lebanon, Pa., for appellee.

Before ADAMS and GARTH, Circuit Judges, and GERRY, District Judge.*

* Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

1. Paragraph five of the letter provided:
Drafts, when presented for negotiation, must be accompanied by the following documents:
(a) Your invoice:
(b) Your signed statement certifying that Michter's Distillery, Inc., has not paid in full such invoice rendered on the above men-

### OPINION OF THE COURT
GARTH, Circuit Judge.

#### I.

The issue presented by this case is whether, under 12A P.S. § 5–114(2)(b), a bank may refuse to honor a draft on a letter of credit, when a condition of the letter of credit is that invoices be submitted and certified as unpaid, and when the bank has been given notice that invoices submitted with the draft have in fact, contrary to the certification, been paid. We hold that, when a document required under the terms and conditions of a letter of credit is an invoice certified not to have been paid, submission of such a certified invoice, when the invoice is in fact known by the beneficiary to have been paid, is "fraud in the transaction" within the meaning of 12A P.S. § 5–114(2), thus relieving the issuing bank, under 12A P.S. § 5–114(2)(b), of the obligation to honor the draft.

#### II.

On February 28, 1979, appellee Peoples National Bank ("Bank") issued an irrevocable letter of credit in the amount of $65,000, in favor of the beneficiary, Roman Ceramics Corporation ("Roman"), and to the account of Michter's Distillery, Inc. The credit was made available to pay for Michter's orders of ceramic decanters from Roman, and was limited by its terms to invoices for ceramic decanters shipped to Michter's before September 1, 1979. The letter required that any draft on the credit be accompanied by the unpaid invoice and by a certification that the invoice had not been paid.[1]

On October 9, 1979, a meeting was held between Harold Roman, president of Roman, and T.D. Veru, president of Veru,[2] at

tioned purchase order in accordance with your normal terms and policies, and the amount due and payable to you by reason of the nonpayment of such purchase order.

2. On June 26, 1979 Michter's changed its name to Distillery Road, Inc. and sold its assets, including the right to use the name Michter's Distillery, to T.D. Veru, Inc. The Bank was assured by Veru that all obligations of Michter's incurred before July 26, 1979 would be paid by Veru.

which it was agreed that invoices dated on or before September 11, 1979, including the five in question here, and totalling $220,200, were due and owing to Roman. It was agreed that Veru would pay this amount forthwith and that Veru should receive a credit of some $3,000 to compensate for the cost of financing.

Roman contended, and Veru denied, that this agreement and the credit were conditioned upon payment by Veru on the day following the meeting. In any event, on Monday, October 15, six days after the meeting, Veru wired $217,000 to Roman's account. Mr. Roman, claiming that the agreement reached at the October 9 meeting had lapsed because Veru had not paid by October 10, chose to allocate some of the wired funds to pay five invoices dated *after* September 11, 1979, and to pay one "pro forma" invoice drawn up by Roman for the occasion. As a result of this attempted allocation, Roman regarded five invoices, dated prior to September 11, 1979, as unpaid. It was these latter five invoices for which Roman attempted to collect payment by drawing on the letter of credit. Veru, having been notified by Roman of this intended allocation, instructed the Bank not to honor Roman's attempted draft, on the ground that the invoices had been paid.

On October 19, 1979, Roman presented to the Bank a draft for $64,020 on the letter of credit, attaching five invoices[3] totalling $64,020, and a certification by Roman's accountant that Michter's had not paid the invoices in accordance with normal terms and policies. On October 22 the Bank notified Roman that Veru had advised it that no invoices for shipments prior to September 1, 1979 remained unpaid, and that in consequence the letter of credit had expired.

### III.

On April 15, 1980, Roman filed a complaint against the Bank in federal district court for the Middle District of Pennsylvania, claiming that the terms and conditions of the letter of credit had been satisfied by the documents submitted, and that Roman was therefore entitled to payment under the letter.[4] The Bank's answer denied that the terms and conditions of the letter of credit had been met and raised, among others, the defense that all invoices for decanters dated before September 1, 1979 had been paid.[5] The Bank also filed a counterclaim for attorney's fees. Roman moved for summary judgment, arguing on the basis of *Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316 (1975), that the Bank's defense was unavailing because the obligations of the Bank on a letter of credit did not depend on performance of the underlying contract. App. 28a–31a.

By order of August 27, 1980 the district court found, on the basis of the undisputed facts, that "the documents supplied by Roman with the draft comply, on their face, with the terms and conditions of the letter of credit[.]" App. 62a. Rejecting Roman's second contention, however, the district court held that, if the Bank correctly asserted that it had notice that the invoices had already been paid, then this would constitute fraud in the transaction within the meaning of 12A P.S. § 5–114(2).[6] The

---

**3.** One invoice dated August 8, 1979 and four invoices dated August 20, 1979.

**4.** Roman had previously filed an action demanding payment, from Distillery Road, Inc. and the guarantors of Michter's Distillery, for some of the five invoices, dated after September 11, 1979, to which Roman had allocated Veru's wire payment. Civ. No. 79–1583 (M.D. Pa.). Roman had also counterclaimed for payment of these same goods, in response to Veru's claim based on allegedly defective merchandise and unfair competition. Civ. No. 80–0026 (M.D.Pa.). On December 4, 1980, Roman filed a motion asking to consolidate the present action with Civ. No. 79–1583 and with Roman's counterclaim in Civ. No. 80–0026. This motion was denied by order of January 9, 1981.

**5.** This contention was set forth as Defendant's Seventh Defense, and was stated as follows:

15. It is believed and therefore averred that all invoices to plaintiff for ceramic decanters, prior to September 1, 1979 have been paid in full.

**6.** 12A P.S. § 5–114(2) provides:

court held that a dispute of fact existed as to whether the invoices had been paid prior to the draft and whether the Bank had received notice of that fact. App. 66a. The court therefore denied Roman's summary judgment motion without prejudice and ordered the parties to provide further affidavits and documents. App. 67a.

On September 11, 1979, the parties filed cross motions for summary judgment and supplemental affidavits. In an opinion and order filed November 25, 1980, the court found that the Bank did have notice of Veru's claim that the invoices had been paid, and that Veru had intended that the wired funds be applied to the August invoices. The court held, however, that a dispute of fact existed as to whether Roman had agreed to apply the wired funds to the earlier invoices. Thus, the court denied the motions for summary judgment and ordered trial on the circumstances surrounding Veru's payment to Roman. Upon Roman's motion for reconsideration, the court amended the November 25, 1980 opinion to include the question of notice to the Bank as a disputed issue of fact.

After a non-jury trial, the court found, upon consideration of events at the October 9, 1979 meeting, and of Mr. Roman's conduct after the meeting, that payment by Veru within one day after the meeting was *not* a condition of the agreement reached at the meeting, 517 F.Supp. 526. The court

found, upon further consideration of Mr. Roman's conduct, that Mr. Roman had knowingly and intentionally misallocated the wire payment, with the intention of drawing on the letter of credit so as to be paid twice for the invoices. Applying the test set out in *Intraworld Indus., supra,* the court held that Roman's conduct in submitting the paid invoices was conduct befitting "an unscrupulous beneficiary" and that it "so vitiate[d] the entire transaction that the legitimate purposes of the independence of Roman's letter of credit with Peoples [Bank] are no longer served." App. 206a–07a (citing *Intraworld Indus., supra,* and *W.Va. Housing Dev. Fund v. Sroka,* 415 F.Supp. 1107, 1108, 1114 (W.D.Pa.1976)).

The court therefore held that Roman's attempted draft constituted fraud in the transaction under 12A P.S. § 5–114(2). The court also found that the Bank had had notice of Roman's fraud and held, therefore, that the Bank had acted within its rights [7] under 12A P.S. § 5–114(2)(b) in refusing to honor Roman's draft. Judgment was thereupon entered for defendant Bank.

Upon Roman's motion to alter or amend the judgment, the court agreed that, under Pennsylvania law, fraud must be established by clear, precise and convincing evidence, and that the burden is upon the party relying on fraud. The court found, however, that the Bank had met this burden. App. 219a.[8] Roman's appeal followed.

(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Section 7–507) or of a security (Section 8–306) or is forged *or fraudulent or there is fraud in the transaction*

(a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3–302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (Section 7–502) or a bona fide purchaser of a security (Section 8–302); and

(b) in all other cases as against its customer, *an issuer acting in good faith may honor*

*the draft* or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents *but a court of appropriate jurisdiction may enjoin such honor.*
(emphasis added)

**7.** The court noted that, although § 5–114(2)(b) provides expressly only that the bank *may honor* the draft, and *may be enjoined from honoring,* the Code also provides that the bank *may refuse to honor.* App. 209a (citing U.C.C. § 5–114 Comment (2): "When, however, no innocent third parties as defined in subsection (a) are involved the issuer is *no longer under a duty to honor.*") (emphasis added).

**8.** Upon Roman's subsequent motion to enter judgment in favor of Roman on the Bank's counterclaim for attorney's fees, the court dismissed the Bank's counterclaim without prejudice. No appeal from that order is before us.

## IV.

Roman's letter of credit provides, and both parties agree, that it is to be governed by the Uniform Commercial Code of Pennsylvania. The district court read the Bank's seventh defense as raising a claim of fraudulent documents or fraud in the transaction under 12A P.S. § 5–114(2). App. 57a.[9] Thus, the court properly applied the standards for "fraud in the transaction" or "fraud in the documents" developed by the Pennsylvania Supreme Court in applications of Section 5–114(2)(b).

The definitive case setting forth the standards under Pennsylvania law for application of 12A P.S. § 5–114(2)(b) is *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975).[10] Although in that case the Pennsylvania Supreme Court determined that "fraud . . . not apparent on the face of the documents" had not been demonstrated, the court announced the test under which the Section 5–114(2) exception to the issuer's duty to honor must be judged.

In its discussion of the appropriate standard, the Pennsylvania Supreme Court began by emphasizing that the basic policy of letter of credit law was to assure prompt payment to sellers by virtue of the independence of the letter of credit obligation from performance of the underlying contract.[11] The court went on to emphasize that, in light of this basic policy, the exception to the duty to honor created by Section 5–114(2)(b) must be narrowly construed.[12]

**9.** Roman contends that the Bank's seventh defense fails to set forth affirmatively the defense of fraud, as required by Fed.R.Civ.P. 8(c), and that it fails to state with particularity the circumstances constituting fraud, as required by Fed.R.Civ.P. 9(b).

Roman did not raise this contention until its *second* motion for summary judgment, filed *after* the court had filed its detailed statement of the applicable law and of the factual issues in dispute. Thus, if Roman did not waive this contention, it is at any rate clear, both from Roman's own memoranda addressed to the trial court discussing the detailed factual issues, and from the careful discussion provided by the district court, that Roman was in no way prejudiced.

**10.** *Intraworld* involved a controversy that concerned whether, under the law of Switzerland, the lessor, Cymbalista, had terminated a lease of a Swiss hotel thus releasing the lessee, Intraworld, from payment of rent under the lease. Allegedly contingent on this question was the question whether the Swiss lessor could draw upon a letter of credit that the Girard Trust Bank had issued as security in connection with the lease. Because of the context in which the controversy arose (the denial of a preliminary injunction), the Pennsylvania Supreme Court was required to determine only if there was "an apparently reasonable ground" for the trial court's refusal of the injunction. The Pennsylvania Supreme Court held that because Intraworld, in this situation, had failed to show that Cymbalista lacked a bona fide claim to rent, there was "an apparently reasonable ground for refusing an injunction." *Intraworld, supra*, 461 Pa., at 363, 336 A.2d, at 327. Thus, despite the preliminary injunction context, the court did hold that the party relying on section 5–

114(2) must show "no bona fide claim to payment" before the issuing bank may refuse to honor a draft on a letter of credit.

**11.** The court stated:

Letters of credit have long served as a financial device in international sales of goods. The primary purpose of a letter of credit is to provide assurance to the seller of goods, (i.e., the "beneficiary," see 12A P.S. § 5–103(1)(d)) of prompt payment upon presentation of documents. A seller who would otherwise have only the solvency and good faith of his buyer as assurance of payment may, with a letter of credit, rely on the full responsibility of a bank. Promptness is assured by the engagement of the bank to honor drafts upon the presentation of documents.

The great utility of letters of credit flows from the independence of the issuer-bank's engagement from the underlying contract between beneficiary and customer. Long-standing case law has established that, unless otherwise agreed, the issuer deals only in documents. If the documents presented conform to the requirements of the credit, the issuer may and must honor demands for payment, regardless of whether the goods conform to the underlying contract between beneficiary and customer.

*Intraworld Indus., supra*, 461 Pa., at 357, 336 A.2d, at 323 (footnote omitted).

**12.** The court stated:

In light of the basic rule of the independence of the issuer's engagement and the importance of this rule to the effectuation of the purposes of the letter of credit, we think that the circumstances which will justify an injunction against honor must be narrowly lim-

After examination of the leading case of *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct. 1941),[13] the court announced its adherence to the *Sztejn* principle:

> We conclude that, if the documents presented by [the beneficiary of the letter of credit] are genuine in the sense of *having some basis in fact,* an injunction must be refused. An injunction is proper only if [the beneficiary], comparable to the beneficiary in *Sztejn, has no bona fide claim to payment* under the lease.

*Intraworld Indus., supra,* 461 Pa., at 361, 336 A.2d, at 325 (citation omitted) (emphasis added). The court then went on to conclude that honor of the *Intraworld* letter of credit ought not to be enjoined on the record then presented.

■ The district court in the present case was correct in concluding that, under Pennsylvania law, if the circumstances are such that the honor of the draft could be enjoined, then the bank was within its rights to determine on its own initiative that the draft should not be honored. Thus, if the documents submitted have "no basis in fact" and the beneficiary therefore "has no bona fide claim to payment under the [underlying contract]," then the bank may properly be enjoined from honoring, and *a fortiori,* the bank may on its own initiative refuse to honor. *See* note 7, *supra.* Thus, the district court here entered judgment for the bank which had refused to honor Roman's draft.

Roman's principal argument focuses on the Pennsylvania law applied by the district court. Roman contends that the district court, by inquiring at all into the basis for the documents submitted by Roman to the bank, "seriously erodes the policy reasons behind insuring the independence of the issuing Bank's obligations." Appt. brief 16.

■ The difficulty with Roman's argument, however, is that it is not advanced before the Pennsylvania state courts, but is rather urged in a federal forum, which is bound by the established state substantive law, in this case, the law of Pennsylvania. Thus, even if our judgment as to the proper interpretation of Section 5–114(2) fraud should differ from that established by the Supreme Court of Pennsylvania, and we do not intimate that it does, we would be required to accept the interpretation of that court as "the final arbiter of what is state law." *West v. American Telephone and Telegraph Co.,* 311 U.S. 223, 236, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

The Pennsylvania Supreme Court in *Intraworld* has already carefully weighed the competing strengths of the policies implicated by letters of credit. On the one hand, the highest court of Pennsylvania has recognized the need for unfettered commercial transactions, which a letter of credit serves. On the other hand, that court has also recognized the importance of the statutory exception to the general rule of independent obligations, when active fraud (as distinct

---

ited to situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served. A court of equity has the limited duty of

'guaranteeing that [the beneficiary] not be allowed to take unconscientious advantage of the situation and run off with plaintiff's money on a *pro forma* declaration which has *absolutely no basis in fact.*'

*Dynamics Corp. of America v. Citizens and Southern National Bank,* 356 F.Supp. 991, 999 (N.D.Ga.1973) (emphasis supplied).

*Id.,* 461 Pa., at 359, 336 A.2d, at 324–25.

**13.** *Sztejn,* on which great reliance was placed in *Intraworld,* involved a letter of credit issued

to secure payment for a shipment of bristles. The complaint alleged that, although the documents accompanying the draft on their face conformed to the letter of credit, in fact, they were fraudulent because they represented not bristles, but boxes of worthless material fraudulently filled and shipped by the vendor of the alleged goods. The plaintiff buyer sought to enjoin payment to the seller on a draft drawn under the letter of credit; the bank moved to dismiss the plaintiff's action for failure to state a claim for relief. The *Sztejn* court denied the bank's motion to dismiss the plaintiff's complaint. It held that, where the seller was deemed to be fraudulent and the bank was deemed to have been given notice of the fraud in presentation of the draft, payment of the draft would properly be enjoined.

from mere breach of warranty) is practiced by the beneficiary of the letter of credit. It is not our function to remake the difficult policy determinations leading to the establishment of such substantive state law, when the necessary determinations have already been announced by a state's highest court.

The Pennsylvania Supreme Court has also made clear that:

> [a] party who relies on fraud or forgery has the burden in the first instance of proving the facts upon which the alleged fraud or forgery is based, and these facts must be established by evidence that is clear, direct, precise and convincing.

*Carlson v. Sherwood,* 416 Pa. 286, 206 A.2d 19, 20 (citation omitted). *See also Ratay v. Lincoln National Life Ins. Co.,* 378 F.2d 209, 212 (3d Cir.1967). This evidentiary principle also applies to the use of fraud as a defense. *See Ratay, supra,* 378 F.2d, at 212. Thus, the district court was correct in holding that before the issuer of a letter of credit may be found to have been justified in refusing payment[14] it must be shown by clear, direct, precise and convincing evidence that the claim of the party attempting to draw on the letter of credit "has no basis in fact", and thus that this party "has no bona fide claim to payment" at all. *Intraworld, supra,* 461 Pa., at 361, 336 A.2d, at 325. This very strong showing is consistent with the concern of the Pennsylvania Su-

preme Court in *Intraworld,* where that court sought to limit severely those situations where "the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Intraworld, supra,* 461 Pa., at 359, 336 A.2d at 324–25. Thus, the Pennsylvania Supreme Court struck a balance between, on the one hand, the basic policy served by letters of credit and, on the other, the concern of courts of equity not to reward fraud, and in so doing established guidelines for those extreme situations where fraud vitiating the transaction was demonstrated.

The standard for Section 5–114(2) and the requirements of its proof having been established by the Pennsylvania Supreme Court, all that properly remains for a federal court sitting in diversity is to apply correctly that standard and those evidentiary requirements to the facts of the controversy before it. *Cf. Blair v. Manhattan Life Ins. Co.,* 692 F.2d 296, 304 n. 1 (3d Cir.1982) (Garth, J., dissenting) (state standards of sufficiency of evidence to reach jury must be applied by federal court sitting in diversity). The district court so held, and we agree.

## V.

Roman also contends, however, that the district court incorrectly applied the *Intraworld* standard. Roman argues, first, that

---

**14.** Judge Adams expresses concern that issuing banks will "be placed in the position of having to develop ... a record" of the sort developed by the district court in this case, before they may safely refuse, on grounds of fraud, to honor drafts on letters of credit. At 1218–1219.

We observe, however, that the obligations placed on issuing banks with respect to notice of relevant facts are prescribed by the UCC itself. 12A P.S. § 1–201(26) provides in relevant part:

> A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.

12A P.S. § 1–201(25) provides in relevant part:

> A person has "notice" of a fact when
> (a) he has actual knowledge of it; or
> (b) he has received a notice or notification of it; or

> (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

In the present case, Mr. Davis, a guarantor of Michter's account to Roman, phoned Mr. Bucher, the senior vice president of the bank who had issued the letter of credit to Roman, and informed him that all invoices dated before September 1979 had been paid and that the obligation of the bank under the letter had therefore terminated. App. 412a–16a (testimony of Mr. Bucher). The district court was correct in concluding that a phone call to the responsible bank official by a customer well known to him was "such [a] step[ ] as may be reasonably required to inform" the bank that the invoices had been paid, and that Roman's draft was therefore an attempt to be paid twice for these invoices. App. 208a–09a.

in allocating Veru's wire payment to invoices other than those agreed upon, Roman made no misrepresentations, since it openly reported the invoice allocation being made. Roman argues, second, that the court's finding regarding the agreement reached at the October 9 meeting was based simply on a determination not to believe Mr. Roman's account of the meeting, and thus did not satisfy the clear, precise, direct and convincing evidentiary standard required by Pennsylvania to show fraud. Third, Roman argues that because Mr. Roman had a subjective belief that he had a right to payment under the underlying contract, dishonor was not justified.

1.

■ It is true that Mr. Roman notified Veru, by letter of October 18, 1979, of the allocation he intended to make of the wire payment. As the court noted, however, Mr. Roman on several other occasions took the inconsistent position that the wire payment had been used to pay all invoices dated on or before September 11, 1979. App. 199a.[15] It was, indeed, largely because of the conflicting positions taken by Mr. Roman with respect to this and other issues that the court found that Mr. Roman had knowingly and intentionally allocated the wired funds in contravention of his agreement with

Veru. App. 197a–201a. By doing so, Roman thereby in effect misrepresented that the pre-September 11 invoices, which had in fact been paid by Veru's wire payment, still remained unpaid. That he openly acknowledged at the time that this was what he was doing, hardly excuses his conduct, since the gravamen of the charge is that he attempted, by drawing on the letter, to be paid twice. The district court specifically found both that the payment had been intentionally misallocated so that Roman could attempt to be paid twice for the pre-September 11 invoice,[16] and that this conduct "so vitiates the entire transaction that the legitimate purposes of the independence of Roman's letter of credit with People's [Bank] are no longer served." App. 206a. Thus, this fraudulent conduct was properly held to be sufficient to satisfy the exception under Section 5–114(2)(b).

2.

Roman argues that the court's findings are based only on a decision not to credit Mr. Roman's affidavit and therefore that they do not meet the clear and convincing evidence standard required by Pennsylvania for showing fraud. *See Easton v. Washington County Insurance Co.,* 391 Pa. 28, 137 A.2d 332 (1957).[17] We do not agree.

---

**15.** The district court opinion characterizes the contradictions in Roman's position:

> On one hand, Mr. Roman swears that the agreement reached at the meeting was for Veru to pay only for all invoices dated on or before September 11, 1979. This position is echoed by all parties in this proceeding and is supported by the available documents. (PX–2; PX–4.) We are firmly convinced that this was the agreement. On the other hand, Mr. Roman dispatched the October 18, 1979 letter in which he claimed that the agreement reached at the meeting was to pay for most, but not all, of the pre-September 11, 1979 [invoices], for all five invoices dated after September 11, 1979, and for some item of Mr. Roman's creation, a pro forma invoice.
>
> When questioned about Veru's receipt of the October 18, 1979 letter and whether it led to any discussions, Mr. Bower responded:
> A. Yes, we immediately recognized it was absolutely not what we agreed to.
> Q. And—
> A. We thought it rather comical that Mr. Roman would find us paying invoices that

had yet to even be billed, "pro formas," while at the same time leaving open invoices that are more than 30 days old. It is ridiculous on its face.
> (Bower 38–39.) We agree with Mr. Bower's assessment of the alleged allocation.

App. 200a.

**16.** The court stated:

> Mr. Roman, however, intentionally misapplied the payment to all five post-September 11, 1979 invoices and the fictional pro forma invoice. He knew that Veru had satisfied its agreement with Roman and had paid for all pre-September 1, 1979 invoices, but he juggled Roman's record and the payment to show that five of those invoices remained unpaid. Having done so, he attempted to be paid twice for those invoices by drawing on the letter of credit.

App. 205a.

**17.** In *Easton,* the Pennsylvania Supreme Court explained the clear, direct, precise and convincing evidence standard as follows:

There are in the record affidavits and testimony by Mr. Veru, Mr. Bower (Veru's accountant), Mr. Davis (Michter's guarantor), and Mr. Roman himself, concerning the events of the October 9 meeting and Mr. Roman's activities thereafter. Additionally, the record contains exhibits which support the district court's findings. *See, e.g.,* App. 529a–30a. Even a cursory examination of the district court's opinion reveals that all of this evidence was considered by the district court when it framed its findings.

### 3.

█ Finally, Roman's assertion that Mr. Roman was acting in subjective good faith when he submitted the draft documents to the Bank was simply rejected by the district court. As we have noted, the court found that Mr. Roman was aware at the time he submitted the draft that the pre-September 11 invoices had in fact been paid, and that he nevertheless submitted the draft, intending that he receive payment twice for the same invoices. App. 205a. We are satisfied that there was clear and convincing evidence from which the court could so conclude, and Roman brings forward no evidence that was not carefully reviewed by the district court.

### 4.

Thus, our independent review of the record satisfies us that the district court's finding, that fraud by Roman sufficient to invoke the exception of Section 5–114(2) had been shown by clear and convincing evidence, was not clearly erroneous. *See Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir. 1972); *Hunt v. Pan American Energy, Inc.,* 540 F.2d 894, 901 (8th Cir.1976) (clearly erroneous standard applied in context of "clear and convincing" state evidentiary burden). Because we must therefore accept those findings, we conclude, as did the dis-

trict court, that Roman's attempt to draw on the letter of credit "had no basis in fact." Because Mr. Roman knew that the pre-September 11, 1979 invoices had already been paid, he could have had "no *bona fide* claim to payment." *See Intraworld, supra,* 461 Pa., at 361, 336 A.2d, at 325.

### VI.

We conclude therefore that the district court correctly applied the proper standard for "fraud in the transaction" under 12A P.S. § 5–114(2)(b), when that court determined that Roman, as an "unscrupulous beneficiary [seeking] to take advantage of the traditional independence of [the Bank's] obligations under the letter of credit," App. 207a, had no bona fide claim to payment. This conclusion, further, was supported by clear and convincing evidence more than sufficient to satisfy the Pennsylvania standard for showing fraud. The judgment of the district court will, accordingly, be affirmed.

ADAMS, Circuit Judge, dissenting from the judgment of affirmance.

I would reverse the judgment of the district court, inasmuch as I do not believe that the conduct complained of in this case amounts to "fraud in the transaction" as that term has been defined under Pennsylvania law. Moreover, I believe that the decision announced by the Court today will increase the pressure on financial institutions to dishonor letters of credit, thus making less certain the underpinnings of many commercial transactions.

### I

Letters of credit provide an effective, efficient, and economic means of guaranteeing payment to a seller of goods or services. For a fee, the issuer, usually a bank,

---

The meaning of [the requirement of clear and convincing evidence] is that '[plaintiffs'] witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and con-

vincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' *Broida, to Use of Day v. Travelers Insurance Co.,* supra, 316 Pa. [444] at 448, 175 A. [492] at page 494. *Easton v. Washington County Insurance Co.,* 391 Pa. 28, 137 A.2d 332, 337 (1957).

commits itself to pay a certain sum when the seller, the beneficiary, satisfies the terms and conditions set out in the letter of credit.

Three distinct contracts are bound up in such credit transactions: the underlying sales agreement between the seller and the buyer; the credit agreement between the bank and its customer (the buyer) specifying the latter's obligation to reimburse the bank when it honors a draft drawn on the letter; and the agreement between the bank and the beneficiary, the letter of credit itself, obligating the bank to pay the beneficiary upon satisfaction of the formal conditions set down in the letter. This last agreement is usually independent of the other contracts. *See Insurance Company of North America v. Heritage Bank,* 595 F.2d 171, 173–74 (3d Cir.1979); H. Harfield, Letters of Credit 77–78 (1979). Thus, the letter of credit is designed to assure the beneficiary of prompt payment upon presentation of the relevant documents. Disputes as to the underlying sales contracts are separate matters to be resolved by the parties to those agreements, the buyers and the sellers.

## II

The issuer's obligation to honor a draft drawn on a letter of credit when that draft is accompanied by conforming documents is codified at 12A P.S. § 5–114(1):

> An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and beneficiary.

Pennsylvania law, which governs this diversity action, reinforces the notion that a letter of credit is independent of the underlying transaction by permitting the issuer to honor a demand for payment despite notification by the customer that there has been a "fraud in the transaction," even though, under such circumstances, "a court of appropriate jurisdiction may enjoin such honor." 12A P.S. § 5–114(2)(b).

Because of the centrality of letters of credit to modern commercial transactions, the Pennsylvania Supreme Court has "narrowly limited" injunctions against the honoring of a letter of credit to those instances of wrongdoing that "so vitiate the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 359, 336 A.2d 316, 324–25 (1975). The majority today recognizes the *Intraworld* standard, but then holds that a seller, who submits certified but disputed invoices, commits a fraud that vitiates the entire transaction, thus justifying a bank in dishonoring a letter of credit. This conclusion, I believe, misreads *Intraworld* and threatens the stability of letter-of-credit transactions.

In *Intraworld,* the Pennsylvania Supreme Court affirmed a trial court's refusal to enjoin the honor of a draft under an international letter of credit. Intraworld sought an injunction on the basis of a "fraud ... not apparent on the face of the documents," alleging that the lease, for which the letter of credit stood as a guarantee of payment, had been terminated. 461 Pa. at 359, 336 A.2d at 324. The court refused to determine the beneficiary's entitlement to payment under the lease, explaining that this entitlement involved a collateral dispute between the parties to the lease that did not affect the agreement between the bank and the beneficiary under the letter of credit. The bank was obligated to scrutinize carefully all documents submitted by the beneficiary, "but once it determined that the documents conformed to the requirements of the credit, it bore no responsibility for the performance of the lease obligations or the genuineness of the documents." 461 Pa. at 364, 336 A.2d at 327. The parties to the lease naturally retain their full rights to have the contractual dispute settled in a court of law, but it would "place an issuer in an intolerable position if the law compelled it to serve at its peril as an arbitrator of contract disputes between customer and beneficiary." *Id.* In the case at hand, the

majority's opinion, in my view, will put issuing banks in the intolerable position the Pennsylvania Supreme Court sought to avoid. The majority has, in addition, fallen victim to what the principal drafter of Article 5 of the Uniform Commercial Code has called the almost irresistible temptation to expand the notion of fraud. Such expansive interpretations are "disastrously inappropriate in a commercial letter of credit transaction." H. Harfield, Letters of Credit 5 (1979).

The leading case on fraud in the letter of credit context remains *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). In *Sztejn* the court enjoined the honor of a draft drawn on a letter of credit because the beneficiary had intentionally failed to ship *any* of the goods ordered by the buyer. It is this kind of egregious fraud that the court in *Intraworld* pointed to in concluding that an injunction is proper only if the beneficiary has no bona fide claim to payment. 461 Pa. at 359–60, 336 A.2d at 325.

In the case before us, the beneficiary had shipped merchandise of the type and quality ordered by the buyer. The sole dispute between seller and buyer concerns the terms of an oral agreement reached after the seller had fully performed its obligations under the sales contract. In holding that non-performance of the subsequent agreement constitutes fraud in the *Sztejn* sense, the majority's opinion will put pressure on financial institutions to go beyond the transactions they normally must monitor in discharging their obligations under letters of credit.

> The cardinal precept that a letter of credit is independent of, and to be construed without reference to, other contracts or arrangements, excludes adjudication of collateral controversies. A showing, however convincing, that there has been a breach of a collateral contract has no relevance to a dispute about the proper performance of a letter of credit contract. A transaction within the purview of Section 5–114 must, therefore, be so intimately related to the independent letter

of credit contract as to be an implied term of that contract.

H. Harfield, Letters of Credit, 84–85.

To conclude that disputed oral agreements reached after one party has fully performed are so intimately related to the independent credit contract as to be an implied term would mean that issuing banks could never be sure of the terms of the agreement governing their obligations under letters of credit. Banks would constantly be drawn into litigation in which the primary dispute is between the beneficiary and the disappointed customer who already has an adequate remedy at law in a breach of warranty action. *See* 12A P.S. § 5–111.

### III

Another facet of the Court's opinion causes concern. When an invoice, certified as unpaid according to the terms of a letter of credit, is in fact known to have been paid, the issuing bank, according to the majority, is relieved of its obligation to honor the accompanying draft. Slip op. at 1209.

Here, the record shows that the only notice of the beneficiary's alleged fraud received by the bank prior to dishonor was a telephone statement by an employee of the customer that the invoices in question had been paid and that the customer did not want the draft to be honored. This hardly amounts to the bank's knowing, in fact, that the invoices had been paid.

The district court was able to find fraud only after it had reviewed facts developed at an extensive trial and had answered some difficult questions of law. Although this kind of litigation is not appropriate, in my view, when the submitted documents conform on their face to the terms of a letter of credit and although the trial court defined "fraud in the transaction" too expansively, the court did have a fully developed record on which to base its judgment that the customer had committed fraud. The same is not true of the bank, and if the letter of credit is to have the desired effect, financial credit institutions should not be

placed in the position of having to develop such a record.

The majority opinion appears to conflate the powers and responsibilities of credit institutions and those of trial courts. Declaring itself bound by Pennsylvania law, the majority correctly asserts that a court may enjoin honor of a draft drawn on a letter of credit when it discovers fraud going to the heart of the transaction. But then citing a comment appended to U.C.C. § 5–114(2), Slip op. at 1211, n. 7, the majority goes on to conclude that a bank may also refuse to honor a draft under such circumstances. I am wary of drawing such a conclusion. The comments to the Uniform Commercial Code are notoriously difficult to assess,[1] and given the cautionary note sounded in *Intraworld,* I would await additional guidance from the Pennsylvania courts before relying on a comment to establish principles regulating commercial transactions of such obvious import to the Commonwealth.

### IV

In sum, I believe that the conduct of the seller here, however questionable, is not the kind of fraud that would justify the grant of an injunction against the honor of a letter of credit. In any event, because of the role letters of credit play in modern commerce, disappointed parties to the transactions underlying these letters should be compelled to resolve their disputes in a court of law. Equitable injunctions restraining banks from honoring letters of credit should be confined to narrowly limited circumstances so as to preserve the integrity and efficiency of this method of financing commercial transactions.

Accordingly, I respectfully dissent.

---

**1.** *See* Skilton, Some Comments on the Comments to the Uniform Commercial Code, 1966 *Wis.L.Rev.* 597.