LEONARD A. FEINBERG,
INC. t/a Mr. Noah

v.

CENTRAL ASIA CAPITAL COR-
PORATION, LIMITED and
Fashion Will, Limited.

Civil Action No. 95–8080.

United States District Court,
E.D. Pennsylvania.

May 1, 1997.

Janet Stern Holcombe, Mann, Ungar, Spector, Labovitz, P.C., Judah I. Labovitz, Mann, Ungar, Spector, P.A., Philadelphia, PA, for Plaintiff.

Gary W. Fresen, Baker & McKenzie, Chicago, IL, Jeffrey B. First, Paul D. Keenan, Buchanan Ingersoll Professional Corp., Philadelphia, PA, for Defendant Central Asia Capital Corp., Ltd.

## OPINION

PADOVA, District Judge.

## Table of Contents

I. Factual Background ........................................826
II. Standard of Review........................................828
III. Discussion...............................................828
 A. Choice of Law .......................................828
 B. Letters of Credit ....................................829
 1. Generally .......................................829
 2. The Independence Principle ......................829
 C. Article 5 ............................................830
 1. Scope of Article 5 ..............................830
 2. Definitions .....................................830
 (a). Bank Classifications ........................831
 (b). Obligations Imposed .........................833
 (c). Central Asia's Classification ...............833
 3. Does Article 5 Apply? ...........................835
 (a). Central Asia's Position ......................835
 (b). Feinberg's Position .........................835
 (c). Applicability Conclusion ....................836
 D. Feinberg's Case......................................838
 E. Common Law Claims .................................841
 1. Fraud ..........................................841
 2. Conversion......................................844
 3. Civil Conspiracy ...............................846

 4. Tortious Inducement (Interference With Contractual Relations) .......... 846
 5. Negligent Misrepresentation ...................................... 846
 F. RICO ...................................................... 847
 1. RICO Analysis ............................................... 849
 (a). Predicate Acts ......................................... 849
 (b). Continuity ............................................. 849
 (c). "Enterprise" ........................................... 850
 (d). Injury ................................................ 850
 (e). Fraud ................................................ 850
 (f). Conspiracy ............................................ 850
IV. Conclusion ................................................. 851

Plaintiff, Leonard A. Feinberg, Inc. ("Feinberg"), a Pennsylvania corporation, brings suit against two Hong Kong corporations, Central Asia Capital Corporation, Limited ("Central Asia") and Fashion Will, Limited ("Fashion Will").[1] Before the Court is Central Asia's Motion for Summary Judgment filed pursuant to Fed.R.Civ.P. 56(c). For the following reasons, the Court will grant in part and deny in part Central Asia's Motion.

The Court remarks preliminarily that it faces an issue of first impression: specifically, whether the customer of a letter of credit may maintain statutory and common law causes of action against a bank authorized by the issuing bank under a red clause to advance funds to the beneficiary of that letter of credit.

## I. Factual Background

Feinberg imports and sells clothing in the United States, and Fashion Will supplies Feinberg with both raw materials and finished garments. In March, 1995, Feinberg contracted with Fashion Will to purchase 30,000 dozen cotton rompers.[2] Fashion Will requested that Feinberg obtain a letter of credit naming Fashion Will as the beneficiary. On March 28, 1995, Feinberg caused Meridian Bank ("Meridian"), located in Philadelphia, Pennsylvania, to issue a letter of credit ("Letter 1") in the amount of $1,000,-000, naming Fashion Will as the beneficiary.

(See Pl.'s Mem. Opp. Def.'s Mot. Summ. J. Ex. 9 ("Pl.'s Mem.")). Under the terms and conditions of Letter 1, after Fashion Will presented specific documents to Meridian indicating that Fashion Will was making a shipment of merchandise to Feinberg, Meridian would provide Fashion Will with the purchase price for the merchandise. Under Letter 1, Feinberg remained ultimately liable to Meridian.

On March 30, 1995, Fashion Will asked Feinberg to modify Letter 1 by adding a "red clause." Fashion Will told Feinberg that Fashion Will could not complete Feinberg's order without the red clause. The red clause provided:

> UNDER "OTHER TERMS / INSTRUCTIONS," PLEASE INCLUDE 'RED CLAUSE' TERMS: NEGOTIATIONS UNDER THIS LETTER OF CREDIT ARE RESTRICTED TO CENTRAL ASIA CAPITAL–CORP. LTD., HONG KONG. RED CLAUSE FACILITY: CENTRAL ASIA CAPITAL CORP. LTD. HONG KONG AUTHORIZED TO MAKE SIXTY PERCENT ADVANCES UNDER THIS LETTER OF CREDIT (SUCH ADVANCES REDUCE AVAILABLE BALANCE HEREUNDER) TO FASHION WILL LTD. ONLY (NOT TRANSFEREES) AVAILABLE BY FASHION WILL LET. SIGHT DRAFT ON CENTRAL ASIA CAPITAL CORP. LTD. HONG KONG FOR THE AMOUNT

---

**1.** The Complaint asserts nine causes of action: fraud (Count I); conversion (Count II); Uniform Commercial Code violations (specifically "fraud in the transaction") (Count III); civil conspiracy (Count IV); violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C.A. S § 1961–1968 (West 1984 & Supp.1997) ("RICO") (Count V); negligent misrepresentation (Count VI); breach of fiduciary duty (against Fashion Will only) (Count VII); breach of contract (against Fashion Will only) (Count VIII); and tortious inducement (against Central Asia only) (Count IX). On March 6, 1996, default was entered as to Fashion Will. (See Doc. No. 9).

**2.** A romper is "a one piece garment esp. for children, with the lower part shaped like bloomers." *Webster's Collegiate Dictionary* 1022 (9th ed.1990).

OF THE ADVANCE AND FASHION WILL LTD. WRITTEN UNDERTAKING ADDRESSED TO LEONARD A. FEINBERG, INC. STATING 'WE HEREBY ACKNOWLEDGE RECEIPT OF USD600000.00 REPRESENTING AN ADVANCE PAYMENT UNDER LETTER OF CREDIT NO. 00499573 ISSUED BY MERIDIAN BANK. WE HEREBY CERTIFY THAT THESE FUNDS WILL BE USED TO PURCHASE RAW MATERIAL OF FINISHED PRODUCTS TO ENABLE U.S. TO EFFECT SHIPMENTS OF LADIES WEARING APPAREL AND FURTHER UNDERTAKE TO DELIVER CONFORMING SHIPPING DOCUMENTS. AS PER THE LETTER OF CREDIT, TO AUTHORIZE CENTRAL ASIA CAPITAL CORP. LTD. HONG KONG OR BEFORE JULY 30, 1995 AND PROCEEDS SIXTY PERCENT OF EACH DRAWING PLUS INTEREST TO RETIRE THE PRINCIPAL AND INTEREST AMOUNTS DUE AND OWING TO THEM.'

REIMBURSEMENT INSTRUCTION: UPON RECEIPT OF CONFORMING DOCUMENTS WE MAKE ADVANCE PAYMENT AS INDICATED IN THE RED CLAUSE FACILITY ABOVE AND DEDUCT FROM THE PROCEEDS OF PAYMENTS MADE BY U.S. AND ALL AMOUNTS DUE TO YOU. IN THE EVENT SUCH DOCUMENTS ARE NOT PRESENTED TO YOU ON OR PRIOR TO JULY 30TH 1995 THEN YOU MUST SEND U.S. TESTED TELEX NOT LATER THAN THE SPECIFIED L/C EXPIRY DATE INDICATING THE SAME AND THE AMOUNT OF OUTSTANDING ADVANCES PLUS INTEREST DUE AND WE WILL REIMBURSE YOU IN ACCORDANCE WITH YOUR INSTRUCTIONS.

All other terms and conditions of the original credit instrument remain unchanged.

(Def.'s Mem. Supp. Mot. Summ. J. Ex. 1) ("Def.'s Mem.").[3]

On April 4, 1995, the red clause was added to Letter 1, allowing Central Asia to advance Fashion Will money needed to purchase raw materials to fill Feinberg's order without ac-

tually requiring Fashion Will to first present the specified documents to Meridian. (*See* Pl.'s Mem. Ex. 13). In the future, after Fashion Will shipped the merchandise to Feinberg, Central Asia was to present the specified shipping documents to Meridian—sight drafts and an undertaking by Fashion Will certifying that the advance was being used to purchase raw materials of finished products—in conjunction with Central Asia's request for reimbursement. Between April 6, 1995 and September 5, 1995, in accordance with Fashion Will's requests, Feinberg induced Meridian to modify Letter 1 to extend certain dates and increase the amount of credit. (*See* Pl.'s Mem. Exs. 17–18; Exs. 20–24; Ex. 28).

On April 10, 1995, Central Asia sent a telex to Meridian stating that it had advanced Fashion Will $600,000 pursuant to Letter 1's red clause. Central Asia attached the undertaking from Fashion Will. Central Asia repeatedly advised Meridian of its advances to Fashion Will via telex on July 21, 1995, July 25, 1995, September 11, 1995, and September 14, 1995. After Central Asia sent each telex to Meridian, it mailed letters confirming the telexes and enclosing the undertakings by Fashion Will to Meridian's office in Philadelphia. On September 1, 1995, Fashion Will told Feinberg that a typhoon in China had flooded its factory and damaged the merchandise, necessitating a new letter of credit. Feinberg then caused Meridian to issue a second letter of credit ("Letter 2") for $310,-199.18, which also contained a red clause. (*See* Pl.'s Mem. Ex. 39).

On September 27, 1995, Fashion Will informed Feinberg that financial difficulties prevented it from filling Feinberg's orders. At this meeting, Fashion Will also admitted that it used the red clause advances to reduce its indebtedness to Central Asia. According to Fashion Will, the collateral securing its loans from Central Asia had decreased in value, and Central Asia pressured it to use the red clause advances to pay off the loan, instead of purchasing raw materials for Feinberg's order. On De-

---

**3.** Defendants filed a Motion for Summary Judgment on January 30, 1997 ("Def.'s Mem.") and a Supplemental Motion for Summary Judgment on February 28, 1997 ("Def.'s Supp. Mem.").

cember 1, 1995, Central Asia made calls upon Meridian on Letter I and Letter 2.

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. *Id.* Rule 56(c) directs summary judgment "after adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III. Discussion

### A. Choice of Law

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state.... Pennsylvania Courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir.1994) (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941)). In the instant case, the letters of credit contained the following provision:

[t]his agreement, each Credit and all transactions in connection with each Credit shall be interpreted, construed and enforced according to: (i) the 'Uniform Customs and Practice for Documentary Credits' ... (ii) the laws of the Commonwealth of Pennsylvania, including without limitation the Pennsylvania Uniform Commercial Code;

and (iii) the Acts of the Congress of the United States of America.

(Def.'s Mem. Ex. 5 at 9). The red clauses did not alter this provision in the letter of credit. (*See* Def.'s Mem. Ex. 2 at 2 (stating that "[a]ll other terms and conditions of the original credit instrument remain unchanged")).

The Court honors this forum selection provision and applies the statutory and common law of the forum state, Pennsylvania. Article 5 of Pennsylvania's Uniform Commercial Code ("UCC") covers letters of credit. *See* Uniform Commercial Code—Letters of Credit, 13 Pa. Cons.Stat. Ann. §§ 5101–5117 (West 1984 & Supp. 1996) ("Article 5").

The forum selection provision also refers to the Uniform Customs and Practice for Documentary Credits (International Chamber of Commerce Pub. No. 500 (1993 Revision)) ("UCP"). "The UCP was drafted by the International Chamber of Commerce for the purposes of establishing uniformity in the treatment of documentary credits and facilitating international trade practices." *Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co.*, No. 88–758, 1991 WL 353443, at *8 (M.D.Pa. Jan. 7, 1991) (citing *In re Glade Springs, Inc.*, 47 B.R. 780, 783 (Bankr. E.D.Tenn.1985), *aff'd*, 826 F.2d 440 (6th Cir. 1987)), *aff'd*, 968 F.2d 357 (3d Cir.1992).

The UCP, however, neither displaces the UCC nor provides the applicable substantive law. "Pennsylvania regards the UCP as a recording of common practice, and not the substantive law of a state which contracting parties may choose under the choice of law provision of the [UCC]." *Banco Nacional de Desarrollo v. Mellon Bank, N.A.*, 726 F.2d 87, 90 n. 4 (3d Cir.1984) (citations omitted). *See also Sound of Market St., Inc. v. Continental Bank Int'l*, 819 F.2d 384, 388 (3d Cir.1987) ("assuming that Pennsylvania's choice of law rules dictate the application of Pennsylvania law, a Pennsylvania court would apply Pennsylvania's version of the UCC as the governing law even if a letter of credit has been made 'subject' to the UCP"); *Intraworld Indus., Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316, 322–23 (1975) (noting "the UCP is by definition a recording of practice rather than a statement

of legal rules"). While the UCP does not dictate substantive law, the extent to which it may be relied upon for illustration or supplementation remains an open question. *See Sound,* 819 F.2d at 388 n. 2 (stating "[a]lthough we see no reason that the UCP may not be incorporated by reference as a term of the letter of credit ... or be considered as evidence of general banking usage, we need not decide the role of the UCP under Pennsylvania law in the context of this case").

## B. Letters of Credit

### 1. Generally

■ A letter of credit is basically "a promise by the 'issuer' (commonly a bank) to the 'beneficiary' (usually a seller of goods) to extend credit on behalf of the beneficiary's customer (usually a buyer of goods)." *Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 317 (3d Cir.1989) (citation omitted). *See Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co.,* 968 F.2d 357, 360 (3d Cir. 1992) (defining letter of credit as "an engagement by an issuer, usually a bank, made at the request of a customer for a fee, to honor a beneficiary's drafts or other demands for payment upon satisfaction of the conditions set forth in the letter of credit") (citing Article 5 § 5103(a)); *Leney v. Plum Grove Bank,* 670 F.2d 878, 881 (10th Cir.1982) (describing letter of credit as "closely akin to a cashier's check or other negotiable instrument issued by a bank"). Letters of credit have long facilitated the flow of international commerce by providing assurance to the "seller of good[s] (i.e., the 'beneficiary'... ) of prompt payment upon presentation of the documents. A seller who would otherwise have only the solvency and good faith of his buyer as assurance of payment may, with a letter of credit, rely on the full responsibility of the bank." *Intraworld,* 336 A.2d at 323.

"The essential function of this device is to assure a party to an agreement that he will receive the benefits of his performance." *Wood,* 888 F.2d at 317 (citation omitted). When the seller is unfamiliar with the creditworthiness of the buyer, the bank issues a letter of credit and "substitutes its credit for that of the customer," thereby assuring the seller of receiving payment. *Leney,* 670 F.2d at 881. *See Banco Nacional,* 726 F.2d at 91 (referring to letter of credit as an "efficacious arrangement which assures payment for completion of an obligation by placing the duty to pay on an issuer of good financial reputation"). The typical letter of credit transaction involves three distinct relationships:

the underlying contract between the customer and the beneficiary which gave rise to their resort to the letter of credit mechanism to arrange payment; the contract between the bank and its customer regarding the issuance of the letter and reimbursement of the bank upon its honoring a demand for payment; and the letter of credit itself, obligating the bank to pay the beneficiary.

*Sound,* 819 F.2d at 388 (citations omitted). In the instant case, the underlying contract between Feinberg and Fashion Will involved Feinberg's purchase of the cotton rompers from Fashion Will. Feinberg established a second contract—between the issuing bank, Meridian, and its customer, Feinberg—when he caused Meridian to issue letters of credit naming Fashion Will as the beneficiary. Meridian's obligation to pay Fashion Will under the letter of credit constitutes the third relationship.

### 2. The Independence Principle

■ The most salient feature of a letter of credit is "its independence from both the customer-issuer transaction and the underlying contract between the customer and the beneficiary." *Wood,* 888 F.2d at 318 (citation omitted). The "independence principle" dictates that the letter of credit is a "commercial instrument completely separate from the underlying contract between the customer and beneficiary. The independence principle obliges the issuer to honor the draft when the beneficiary presents conforming documents without reference to compliance with the terms of the underlying contract between the customer and the beneficiary." *Tudor,* 968 F.2d at 360 (citation omitted). *See Wood,* 888 F.2d at 318 (remarking that "Pennsylvania considers this independence necessary to preserve the basic policy of letter of credit law, namely to ensure prompt payment to sellers") (citation omitted); *Intraworld,* 336 A.2d at 323 (stating "[l]ongstanding case law has established that, unless

otherwise agreed, the issuer deals only in documents").

"Independence" essentially dictates that "[t]he issuer must honor conforming documents regardless of the terms that may, or may not, govern the underlying contract. A beneficiary who produces proper documents may draw on the letter even if he has not done the performance described by them." *Wood,* 888 F.2d at 318 (citations omitted). *See also Intraworld,* 336 A.2d at 323 (noting "[a]bsent an agreement to the contrary, the issuer is, under the general rule, not required or even permitted to go behind the documents to determine if the beneficiary has performed in conformity with the underlying contract"). In the event that a disagreement arises between the customer and the beneficiary, "the dispute is resolved with the money already in the pocket of the beneficiary . . . . [Furthermore,] when an issuer makes payment under a letter of credit, the issuer is satisfying its own primary obligation to the beneficiary, without reference to the rights of its customer under the underlying contract with the beneficiary." *Tudor,* 968 F.2d at 360. Extension of the independence principle beyond issuing banks to advising banks, confirming banks, and other banks involved as facilitators of letter of credit transactions is an emerging, unsettled area of the law.

## C. Article 5

### 1. Scope of Article 5

Article 5's coverage encompasses, *inter alia,* "a credit issued by a bank if the credit requires a documentary draft or a documentary demand for payment" and a credit that "conspicuously states that it is a letter of credit or is conspicuously so entitled." Article 5 § 5102(a)(1), (3). If the engagement does not fall within these parameters, Article 5 does not apply. *Id.* at § 5102(b). Article 5 defines the reach of the rules and concepts applicable to letters of credit:

(c) **Rules and Concepts of Letters of Credit.**—This division deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this title or may hereinafter develop. The fact that this division states a rule does not by itself require, imply or negate application of the same or

a converse rule to a situation not provided for or to a person not specified by this division.

*Id.* at § 5102(c). An accompanying comment explains:

2. Subsection (3) recognizes that in the present state of law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful financial device. . . . The rules embodied in the Article can be viewed as those expressing the fundamental theories underlying letters of credit. For this reason, the second sentence of subsection (3) makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so. Under Section 1–102(1) such application is to follow the canon of liberal interpretation to promote underlying purposes and policies. Since the law of letters of credit is still developing, conscious use of that cannon and attention to fundamental theory by the court are peculiarly appropriate.

*Id.* at § 5102 cmt. 2.

Section 1103 discusses the interplay between the UCC and common law causes of action and the possibility of displacement and supplementation: "[u]nless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provision." 13 Pa. Cons.Stat. Ann. § 1103 (West 1984).

### 2. Definitions

Article 5 contains a list of definitions, three of which describe the roles played by Feinberg, Meridian, and Fashion Will. Feinberg, the "customer," approached Meridian, the "issuing bank," to procure a letter of credit naming Fashion Will as the "beneficiary." *See* Article 5 § 5103(a) (defining "customer" as "[a] buyer or other person who causes an issuer to issue a credit;" "issuer" as "[a] bank or other person issuing a credit;" and "beneficiary" as the "person who is entitled under

its terms to draw or demand payment"). Furthermore, Article 5's definition of "letter of credit" describes the financial device used in this case. *See id.* (defining "letter of credit" as "[a]n engagement by a bank [Meridian] . . . made at the request of a customer [Feinberg] . . . . that the issuer [Meridian] will honor drafts or other demands for payment upon compliance with the conditions specified in the credit").

■ "Red clause," however, does *not* appear in Article 5. A red clause "permits the beneficiary to receive temporary advances from the opening or confirming bank to enable him to make purchases and shipment of the goods described in the credit, said advances to be repaid with interest out of the proceeds of the beneficiary's drafts and ultimately drawn under the credit." John F. Dolan, *The Law Of Letters Of Credit,* "Glossary of Letter of Credit Terms," G–23 (3d ed. 1996) ("Letters of Credit"). *See also* Charles del Buston, *ICC Guide To Documentary Credit Operations For The UCP 500* 49 (1994) (defining a red clause documentary credit as "a Documentary Credit with a special condition incorporated into it that authorises [sic] the Confirming Bank or any other Nominated Bank to make advances to the Beneficiary before presentation of the documents").

■ Furthermore, Article 5 has codified the independence principle. Specifically, § 5114 addresses the issuing bank's duties and obligations:

(a) **Duty of issuer to honor draft or demand.**—An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary. . . .

Article 5 § 5114(a). The issuer's obligation is not without limitation or exception. In the presence of fraud, the issuer's duty is limited:

(b) **Nonconforming document or fraud.**—Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (section 7507) or of a security (section 8306) or is forged or fraudulent or there is fraud the transaction:

(1) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances that would make it a holder in due course (section 3302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (section 7502) or a bona fide purchaser of a security (section 8302); and

(2) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

Article 5 § 5114(b). Application of § 5114 by the Supreme Court of Pennsylvania led to the development of the phrase "fraud in the transaction" to describe instances implicating § 5114(b)(2). *See Roman Ceramics, Corp. v. Peoples Nat'l Bank,* 714 F.2d 1207, 1213 (3d Cir.1983) (noting the district court's proper application of the "standards for 'fraud in the transaction' or 'fraud in the documents' developed by the Pennsylvania Supreme Court in applications of Section 5–114(2)(b) [sic]"). This exception to the independence principle applies narrowly to "situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Id.* at 1212 n. 12 (citing *Intraworld,* 336 A.2d at 324–25).

**(a). Bank Classifications**

Article 5 defines three types of banks in addition to the issuing bank. An "advising" bank "gives notification of the issuance of a credit by another bank." Article 5 § 5103(a). The advising bank plays an incidental role in the international letter of credit transaction limited to transmitting and authenticating information:

[t]he adviser, using its knowledge of international banking and communications technology, can verify interbank communications and render the advice with virtual certainty that the original communication from the issuer is genuine. Thus, the adviser facilities the establishment of the credit by permitting the seller to rely on the advice as evidence that the issuer has indeed undertaken to honor the seller's draft. The function is simple ... the relationship between the issuer and the adviser is also rather simple.

John F. Dolan, *The Correspondent Bank in the Letter Of Credit Transaction,* 109 Banking L.J. 396, 404 (1993) ("Correspondent Bank"). *See also Sound,* 819 F.2d at 388 (noting "[w]here the issuing bank and the beneficiary have no prior relationship, another bank may be asked to advise the letter of credit") (citation omitted); *Merchants Bank of New York v. Credit Suisse Bank,* 585 F.Supp. 304, 308 (S.D.N.Y.1984) (stating "[t]he advising bank is confined to transmitting information and authenticating the information transmitted").

A "confirming bank" "engages either that it will itself honor a credit already issued by another bank or that such a credit will be honored by the issuer or a third bank." Article 5 § 5103(a). *See also Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro,* 38 F.3d 1571, 1580 (11th Cir.1994) (stating the confirming bank extends "credit on behalf of the issuing bank and is granted a right to reimbursement against the issuer as a matter of law"); Letters of Credit at G–8 (defining "confirmed credit" as "credit to which a party, usually a bank that does business in the market of the beneficiary, has

added its own primary obligation by engaging to pay ... pursuant to the terms of the credit").

The strict obligation undertaken by a confirming bank distinguishes it from the advising bank and likens it to an issuing bank. *See* Article 5 § 5107(b) (stating "[a] confirming bank by confirming a credit becomes directly obligated on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer"); *Banco Gen. Runinahui, S.A. v. Citibank Int'l,* 97 F.3d 480, 482 (11th Cir.1996) (remarking that confirming banks assume "the same obligations as the issuing bank"); *Reed Int'l Trading Corp. v. Donau Bank AG,* 866 F.Supp. 750, 756 (S.D.N.Y.1994) (stating "[t]he conforming bank is obligated to pay the letter of credit to the beneficiary regardless of how it has chosen to secure its obligation"). The advising bank does not, by definition, incur such an obligation. *See Artex, S.R.L. v. Bank One, Milwaukee, Nat'l Ass'n,* 801 F.Supp. 228, 230 (E.D.Wis.1992) (finding "[a] bank acting as an advising bank, however, may become directly obligated on an existing letter of credit if it also acts as a 'confirming bank' by adding its engagement to the issuing bank's engagement") (citations omitted); Letters of Credit ¶ 1.03 (stating "[t]he duties of an adviser, then, are much lighter than those of a confirmer.... [A]n adviser does not assume any obligation to honor the beneficiary's drafts").[4]

The UCP discusses a type of bank neither addressed nor defined in Article 5, the "nominating bank." The nominating bank is "[t]he bank [designated] in the credit as the bank that will pay, accept, incur a deferred

---

4. A fourth bank definition relates to confirming banks, but takes root in the "customer" definition. After confirming a credit, the issuing bank becomes the confirming bank's only customer. *See* Article 5 § 5103(a) (stating, in the "customer" definition, "[t]he term also includes a bank which procures issuance or confirmation on behalf of a customer of that bank").

Moreover, the Court notes that an advising bank is not a "static" entity. If the advising bank incurs an obligation, it may transform into a confirming bank. *See* Article 5 § 5107 cmt. 2 (remarking "[a] confirming bank may of course be an advising bank so far as the issuer's engagement is concerned"); *Artex,* 801 F.Supp. at 230 (finding "[a] bank acting as an advising bank,

however, may become directly obligated on an existing letter of credit if it also acts as a 'confirming bank' by adding its engagement to the issuing bank's engagement") (citations omitted); Letters of Credit at G–2, G–8 (remarking that "[a]n advising bank *may, but does not always, confirm the credit*" and defining confirming bank as an *"[a]dvising bank* that not only advises the beneficiary of the issuance of the letter of credit but also adds its own obligation") (emphasis supplied); Correspondent Bank at 405 (noting "[o]ften, the issuer instructs the adviser not only to advise the beneficiary of the credit's issuance but also to honor the beneficiary's draft on behalf of the issuer, [transforming the advising bank into a 'paying' bank]").

payment obligation, or negotiate the beneficiary's drafts." Letters of Credit at G–19 (citation omitted). Under the UCP,

> [u]nless the Credit stipulates that it is available only with the Issuing Bank, all Credits must nominate the bank (the "Nominated Bank") which is authorised [sic] to pay, to incur a deferred payment undertaking, to accept Draft(s) or to negotiate .... Unless the Nominated Bank is the Confirming Bank, nomination by the Issuing Bank does not constitute any undertaking by the Nominated Bank to pay, to incur a deferred payment undertaking, to accept Draft(s), or to negotiate .... By nominating another bank, the Issuing Bank authorises [sic] such bank to pay, accept Draft(s) or to negotiate, as the case may be, against documents which appear on their face to be in compliance with the terms and conditions of the Credit and undertakes to reimburse such bank in accordance with the provisions of these Articles.

UCP Art. 10(b)(i), (c). *See also Chuidian v. Philippine Nat'l Bank,* 976 F.2d 561, 562–63 (9th Cir.1992) (referring to both UCP Article 10(c) and UCC § 5–107(1) when examining a nominating bank; noting that "nomination by the issuing bank does not constitute any undertaking by the nominated bank to pay, to accept, or to negotiate.... A confirming bank, by contrast, makes a 'definite undertaking' when it adds its confirmation").

### (b). obligations Imposed

Article 5 contains specific provisions articulating the duties and obligations imposed on the banks defined therein. With respect to advising banks, "[u]nless otherwise specified an advising bank by advising a credit issued by another bank does not assume any obligation to honor drafts drawn or demands made for payment under the credit but does assume obligation for the accuracy of its own statement." Article 5 § 5107(a). *See Sound,* 819 F.2d at 390 (noting "the only express obligation of an advising bank is to be accurate in its statement of the letter of credit. Nowhere does the UCC suggest a duty to timely transmit advice").

The same provision speaks to confirming banks: "[a] confirming bank by confirming a credit becomes directly obligated on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer." Article 5 § 5107(b). "The obligation, to the extent of the confirmation, is that of an issuer.... The most important aspect of this rule is that a beneficiary who has received a confirmed credit has the independent engagements of both the issuer and the confirming bank." Article 5 § 5107 cmt. 2. Two sections address the issuing bank. Section 5109 describes the obligation of the issuing bank to its customer, and § 5114 explains the duty and privilege of the issuing bank to honor demands for payment and the exception to that responsibility for fraud in the transaction.

### (c). Central Asia's Classification

The transaction in the instant case involved a fourth commercial relationship in addition to the three relationships between (1) Feinberg and Fashion Will, (2) Meridian and Feinberg, and (3) Meridian and Fashion Will: specifically, that between Central Asia. and Meridian. While the Court easily finds definitions describing the relationships between Feinberg, Meridian, and Fashion Will—(1) customer and beneficiary, (2) issuer and customer, and (3) issuer and beneficiary, respectively—classifying Central Asia's role in this transaction, i.e., a bank authorized by the issuing bank under the red clause to advance funds to the beneficiary, presents difficulty.

Central Asia characterizes itself as either an advising bank or a nominating bank. (*See* Def.'s Supp. Mem. at 5–6; Tr. Oral Argument 4/8/97 at 7). Feinberg objects to Central Asia's self-characterization as an advising bank and points to a reference made by Central Asia's counsel during Robert Feinberg's deposition that the Hong Kong and Shanghai Banking Corporation acted as the advising bank in this transaction. (*See* Def.'s Supp. Mem. Ex. 5 at 113). According to Feinberg, Article 5 does not include a definition of the functions performed by Central Asia and is completely silent as to Central Asia's duties and responsibilities.

Quite clearly, the confirming bank definition is inapplicable. The red clause "authorized" Central Asia to make advances to

Fashion Will. To "authorize" means "[t]o empower, to give a right or authority [permission] to act...." *Black's Law Dictionary* 133 (6th ed.1991). The authority to perform an act does not, however, create an "obligation" to perform an act. The latter is defined as "[t]hat which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, kindness, etc." *Id.* at 1074. The red clause did not impose a duty on Central Asia to advance funds to Fashion Will equivalent to that incurred by the issuer, Meridian. Central Asia enjoyed nothing more than "permission" to furnish the advances. In the absence of such an obligation, Central Asia cannot be a confirming bank.

■ Concededly, the letters of credit and the red clause list the Hong Kong and Shanghai Banking Corporation as the "Advising Bank" and Central Asia as the "Second Advising Bank." (Def.'s Supp. Mem. Ex. 2 at 1678, 1749, 1763, 1790, 1797, 1812, 1834, 1840, 1845, 1862, 1898). Irrespective of the nomenclature employed by the letter of credit, the Court finds that Central Asia's self-description as an advising bank is a misnomer because its activities exceeded those of a typical advising bank. Advising banks verify communications and render advice designed to assure the beneficiary of the authenticity of the issuer's transmission. *See* Correspondent Bank at 405 (describing advising bank's role as "critical, but ... above all the role of an information transmitter"). Specifically, after the advising bank receives "a properly keyed telex [from the issuer], it communicates the information in the telex to its customer by advice, usually a letter, from the adviser to the seller reciting the terms of the issuer's telex or attaching a copy of the telex to the letter." *Id.*

The Court concludes that Article 5 does *not* address the role played by Central Asia in this transaction. The definitions delineated in Article 5 describe advising banks, issuing banks, and confirming banks as well as the obligations assumed by each. Those types of banks, however, fail to accurately depict Central Asia's role in the instant transaction. Central Asia was not acting under any obligation when it made advances under the red clause and it did not advise Fashion Will concerning Meridian's letters of credit. Furthermore, Central Asia did not actually require Fashion Will to first present the shipping documents, a requirement that would be imposed by an issuing bank or a bank that stepped into the shoes of an issuing bank, i.e., a confirming bank. In conjunction with its subsequent requests to Meridian for reimbursement, Central Asia submitted, via telex and later hard copy, the specified shipping documents to Meridian, i.e., the sight drafts and undertakings by Fashion Will. Indeed, this commercial relationship was supported by consideration. Central Asia received compensation under the red clause for the services it provided. (*See* Def.'s Mem. Ex. 1). Central Asia's temporary cash advances were intended to enable Fashion Will to purchase merchandise and ship it to Feinberg, facilitating Fashion Will's ability to fill Feinberg's order and expediting this transaction.

■ While Article 5 fails to address the functions performed by Central Asia, and is completely silent as to Central Asia's duties and responsibilities, the Court cannot say the same with respect to the UCP. The UCP's description of nominating banks accurately describes Central Asia's role in this transaction. The nominating bank neither advises a letter of credit nor incurs an obligation to advance funds thereunder. It is, however, authorized, without any undertaking or obligation, to advance funds to the beneficiary and, thereafter, to seek reimbursement. The definition of red clauses envisages the role played by nominating banks. A red clause "permits the beneficiary to receive temporary advances ... said advances to be repaid with interest out of the proceeds of the beneficiary's drafts and ultimately drawn under the credit." Letters of Credit at G–23. *See also* Charles del Buston, *ICC Guide To Documentary Credit Operations For The UCP 500* 49 (1994) (defining a red clause documentary credit as one authorizing the "Nominated Bank to make advances to the Beneficiary before presentation of the documents"). Accordingly, the definition of a nominating bank best describes the functions performed by Central Asia in the instant case.

### 3. Does Article 5 Apply?

Article 5 fails to address two salient features of this transaction, (1) the addition of the red clause to the letter of credit and (2) Central Asia's status as a nominating bank. The dispositive question in light of this silence is whether Article 5 still applies to the case *sub judice* and provides Feinberg with the appropriate avenue of relief.

#### (a). Central Asia's Position

Central Asia maintains that because the documents at issue clearly constitute "letters of credit," Article 5 governs Feinberg's claims exclusively. Central Asia suggests that the alternative result, i.e., allowing the common law claims to proceed, would disrupt a longstanding policy of facilitating the flow of international commerce through uniform and predictable letter of credit law. Eliminating Feinberg's ability to bring common law claims, suggests Central Asia, comports with the parties' intentions because the letters of credit at issue did not intend that Pennsylvania common law would govern the disputed transactions.

Central Asia recognizes that red clauses are not provided for under Article 5. (*See* Def.'s Supp. Mem. at 2 (noting "no case can be found where a party decided to add a red clause.... [But,] the court [need not] turn to Pennsylvania's common law of torts for an answer")). In fact, Central Asia characterizes the red clause as a separate letter of credit built on an additional promise by Meridian to Central Asia for reimbursement, characterizing Central Asia as a beneficiary to a stand-by letter of credit.[5] Nonetheless, Central Asia looks to the scope provisions of Article 5 and notes the intent therein to "express[ ] the fundamental theories underlying letters of credit" and to empower courts "to apply a particular rule by analogy to cases not within its terms." Article 5 § 5102 cmt. 2. The peculiarity injected into Feinberg's letters of credit by the red clause should not, argues Central Asia, preclude Article 5 from applying because "the documents are so obviously letters of credit that they must be analyzed with the principles

espoused under letter of credit, not tort law." (Def.'s Supp. Mem. at 3).

According to Central Asia, the Court could remain in the realm of letter of credit law—without crossing the line into common law—by looking to the UCP, an expression of custom and practice that specifically addresses nominating banks like Central Asia. The UCP, argues Central Asia, furnishes instruction on the rights and obligations of nominating banks and allows Feinberg to pursue an analogous and appropriate remedy without leaving the confines of letter of credit law, and hence Article 5.

Central Asia asserts that because Article 5 applies to this transaction, the independence principle protects it from liability. The independence principle, claims Central Asia, is premised on a policy of speedy payment and therefore applies to all banks within the letter of credit transaction, including confirming, advising, nominating, and issuing banks. According to Central Asia, the independence principle required it to honor Fashion Will's conforming documents regardless of the terms that governed the underlying contract because a beneficiary like Fashion Will who produces proper documents may draw on the letter even if it has not completed the performance described in those documents. Central Asia does not believe it had any obligation to either look past the face of the documents presented or conduct an investigation. Furthermore, Central Asia proclaims that the fraud alleged in this case did not sufficiently vitiate the transaction to warrant invoking the statutory exception to the independence principle for fraud in the transaction codified in Article 5 § 5114(b)(2)

#### (b). Feinberg's Position

Feinberg objects to being limited to a single cause of action for fraud in the transaction under Article 5, noting that Article 5 is totally silent with respect to both red clauses and banks acting in the capacity that Central Asia did in this transaction. Feinberg directs the Court to Article 5 § 5102, where the Article states its limitations, specifically

---

**5.** A "stand-by" letter of credit "requires the production of documents showing that the customer has defaulted on its obligation to the beneficiary,

which triggers the beneficiary's right to draw down on the letter." *Tudor,* 968 F.2d at 360 (citation omitted).

836

that it "deals with some *but not all* of the rules and concepts of letters of credit." Article 5 § 5102(c) (emphasis supplied). According to Feinberg, the UCC's general proclamation in the displacement provision, 13 Pa. Cons.Stat. Ann. § 1103, requires this Court to allow him to supplement his cause of action with common law claims because *no* provision of Article 5 displaces his claims. *See* 13 Pa. Cons.Stat. Ann. § 1103 (remarking "*[u]nless displaced by the particular provisions of this title* ... fraud, misrepresentation, duress ... or other validating or invalidating cause *shall* supplement its provision") (emphasis supplied). Feinberg also notes the absence, in the UCP, of provisions addressing fraud. Without such provisions, suggests Feinberg, the UCP cannot be considered substantive letter of credit law that would obviate his need to seek common law remedies.

Finally, Feinberg contends that in the absence of an obligation undertaken by Central Asia to advance monies to Fashion Will, it constitutes neither an issuing bank nor a confirming bank, and therefore cannot invoke the protections afforded by the independence principle. Instead, argues Feinberg, Central Asia enjoyed total discretion, regardless of the documents presented by Fashion Will. In the presence of such unfettered discretion, Feinberg claims the Court must impose some duty to act responsibly on banks acting in Central Asia's capacity "so that [Central Asia] does not allow things to happen that it knows are inconsistent with the letter of credit under which it is operating." (Tr. Oral Argument 4/8/97 at 52).

**(c). Applicability Conclusion**

■ The Court concludes that because Article 5 does not address the salient features of the transaction *sub Judice,* specifically the red clause and the functions performed by Central Asia as a nominating bank, both the section addressing scope (§ 5102) and the displacement provision of the UCC (13 Pa. Cons.Stat. Ann. § 1103) direct that Feinberg may pursue redress through Pennsylvania common law. If Central Asia were an issuing bank, an advising bank, or a confirming bank, then Feinberg could seek redress through the provisions in Article 5 articulating the obligations imposed on each bank, specifically §§ 5109 and 5114, 5107(a), and 5107(b), respectively. Article 5, however, does not address nominating banks and does not speak to either Central Asia's obligations as a nominating bank or Feinberg's rights against nominating banks.

The scope provisions of Article 5 support the Court's conclusion by stating that: (1) Article 5 deals with some, but not all, of the rules and concepts of letters of credit; (2) no statute can effectively or wisely codify all the possible law of letters of credit; and (3) the Court has the power to refrain from applying a particular rule by analogy to cases not within its terms. Furthermore, while the United States Court of Appeals for the Third Circuit recognizes that "the courts of Pennsylvania ... are free to extend Code duties by analogy to parties upon whom they are. not expressly imposed," *Sound,* 819 F.2d at 390, another body of jurisprudence warns that Article 5's flexibility "should not be mistaken for approval to range far and wide over the legal landscape in search of legal theories to invoke against the parties to a letter of credit transaction." *Confeccoes Texteis de Vouzela Lda. v. Riggs Nat'l Bank of Washington, D.C.,* 994 F.2d 851, 854 (D.C.Cir. 1993) (citation omitted). *See also Instituto Nacional De Comercializacion Agricola (Indeca) v. Continental Ill. Nat'l Bank & Trust Co.,* 858 F.2d 1264, 1268 (7th Cir.1988) (noting "[i]n large part then adapting letter of credit principles to varying situations in a way that encourages the use of letters of credit is the approved task under Article 5; adapting tort principles not expressly adopted and that tend to discourage the use of such devices is not").

The displacement provisions direct the Court to apply the law relative to fraud, misrepresentation, or other validating or invalidating causes *unless* displaced by the particular provisions of the UCC. Since Article 5 does not address the transaction in the instant case, there is no displacement and the Court shall look to common law.

The UCP's mention of nominating banks does not keep Feinberg's cause of action within the realm of letter of credit law. In Pennsylvania, the UCP records custom and practice. If the Court includes nominating

banks within the context of letter of credit law (and Article 5)—which specifically limits its coverage to issuing banks, advising banks, and confirming banks—it would unjustifiably expand the reach of the Article 5 beyond its intended scope.

For example, the provision in Article 5 addressing the independence principle and fraud in the transaction, specifically § 5114(b)(2), applies only to issuing and confirming banks. *See Banco Gen.*, 97 F.3d at 482 (applying independence principle to both issuing and confirming bank) (citations omitted); *Semetex Corp. v. UBAF Arab Am. Bank*, 853 F.Supp. 759, 770 (S.D.N.Y.1994) (requiring issuing and confirming bank to act pursuant to the independence principle) (citing *Centrifugal Casting Mach. Co. Inc. v. American Bank & Trust Co.*, 966 F.2d 1348, 1352 (10th Cir.1992); *Wood*, 888 F.2d at 318; *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 16 (2d Cir.1979)), *aff'd*, 51 F.3d 13 (2d Cir.1995). In order to entertain Feinberg's fraud claim, the Court would have to forcibly apply § 5114 to nominating banks, entities that Article 5 does not recognize.

A nominating bank authorized, but not obligated, to make advances under a red clause should not enjoy the protection the independence principle affords issuing and confirming banks. While the independence principle affords both issuers and confirmers protection, they pay a price for that protection: the assumption of an obligation to honor. The independence principle is pegged to that obligation, and, in the absence of that obligation, the independence principle does not apply. The Court sees no justification arising out of the nature of the letter of credit transaction and the dictates of predictability in international commerce to restrict common law remedies available to the customer (buyer) against a bank—authorized but not obligated by the issuer to make advances against a letter of credit—that has allegedly engaged in fraud, conspiracy, and / or conversion.

An examination of two cases brought by customers (like Feinberg) against banks with whom they did not have contact provides support for the Court's conclusion, specifically, *Dibrell* and *Confeccoes*. *Dibrell* involved a lawsuit filed by the beneficiary of a letter of credit, Dibrell, against a confirming bank that agreed to confirm the letters of credit on a "silent basis." "A silent confirmation occurs when a bank agrees to confirm a letter of credit, but the agreement to do so does not appear on the face of the letter," and, before the *Dibrell* decision, this device was not "recognized in any published opinion in either state or federal court." *Dibrell*, 38 F.3d at 1580.

In *Dibrell*, the customer alleged breach of contract, estoppel, negligence, fraud and civil RICO. In determining whether the silent confirmation fell within Article 5, the court concluded it "is not the same device as an Article 5 confirmation and clearly falls outside the operation of the UCC. The parties to the silent confirmation differ, as do the rights and obligations under the confirmation agreement." *Id.* Noting that "Georgia courts have also held that common law remedies are available when the theory of recovery falls outside the confines of Article 5," *Dibrell* concluded that "a silent confirmation is a situation which is not provided for by Article 5. Therefore, we hold that Article 5 does not preclude recovery for breach of contract to silently confirm on a common law breach of contract theory." *Id.* at 1582.

In contrast to *Dibrell*, *Confeccoes* dealt with entities that fell within the purview of Article 5 and were specifically defined therein. There, a customer brought suit against a confirming bank, presenting three counts: UCC violations, tort claims (negligence, misrepresentation, failure to communicate), and a claim for breach of warranty. *Confeccoes* first noted that the only duty owed by a confirming bank is to its customer, the issuing bank, and affirmed the district court's dismissal of the customer's UCC claim. The customer's attempt to pursue its claim on the basis of common law tort principles met the same fate. The court noted that the scope provisions in § 5102 indicate that Article 5 deals with some, but not all, of the rules applicable to letters of credit, but it declined to exercise its discretion to expand Article 5's application because it would contradict the UCC's goals and policies. Specifically, "[c]ircumventing the explicit statutory scheme by looking to tort principles would undermine [the exchange function of the letter of credit that rests on objective, predictable standards

with defined expectations and risks]." *Confeccoes*, 994 F.2d at 854. Furthermore, *Confeccoes* objected to the idea of broadening "the confirming party's duty, as defined by the Code, to include the [customer]—a party with whom it had never dealt" because it would "discourage, rather than encourage, the use of the letter of credit device." *Id.* (citation omitted). Essentially, *Confeccoes* rested on the fact that Article 5 specifically addressed the parties to the transaction and their respective rights, duties, and obligations, obviating the need to go outside its parameters in search of common law remedies. *See id.* at 852 (stating "[w]e find that the Uniform Commercial Code ('UCC') governs the relationship of the parties to this dispute and that under it a confirming bank owes no duty to the [customer]").

The instant case resembles *Dibrell.* As in the case of a silent confirmation, Article 5 does not address red clauses and nominating banks, forcing Feinberg beyond the purview of Article 5. Unlike *Confeccoes*, the parties in this transaction are not specifically defined in Article 5, and allowing the pursuit of common law remedies will neither circumvent Article 5's statutory scheme nor undermine its objectivity and uniformity.

Indeed, there is a body of case law that refuses to allow customers to assert causes of action against banks in the absence of privity between the bank and the customer. *See Kools v. Citibank, N.A.*, 872 F.Supp. 67, 72 (S.D.N.Y.1995) (noting "[c]ourts in other circuits have emphasized that in letter of credit transactions, banks have no liability to persons with whom they have had no direct contract") (citing, *inter alia*, *Confeccoes* and *Sound* ). In those cases, however, the banks sued by the customer were specifically defined and addressed by the UCC. *See Cenlin Taiwan Ltd. v. Centon, Ltd.*, 5 F.3d 354, 357 (9th Cir.1993) (finding "any warranty made by [advising bank] . . . extends only to [the advising bank's] immediate purchasers, [the issuing banks, and not the issuing banks' customer]"); *Confeccoes*, 994 F.2d at 853 (finding that confirming bank owes statutory duty only to the issuing bank and not to the issuing bank's customer; since the UCC applies, customer cannot assert common law remedies); *Sound*, 819 F.2d at 390, 395 (concluding advising bank does not owe potential

beneficiary either a contractual, statutory, or tort duty of timely transmission); *Auto Servicio San Ignacio, S.R.L. v. Compania Anonima Venezolana De Navegacion*, 765 F.2d 1306, 1308 (5th Cir.1985) (disallowing negligence action by customer against bank [Hibernia] that "acted as the advising, confirming, and paying bank" because "to the extent there is a duty under Louisiana tort law, it is the duty of care defined by section 5–109, owed by Hibernia only to *its* customer on the letter of credit, [the issuing bank]"). Moreover, as will be discussed *infra*, fraud was neither alleged nor present in any of those cases.

Accordingly, use of the red clause and Central Asia's status as a nominating bank gives rise to rights and obligations that are not contained in Article 5. This transaction falls outside the UCC, and Article 5 does not preclude Feinberg from asserting common law causes of action.

## D. Feinberg's Case

Feinberg has substantiated his allegations with numerous submissions. In conducting a Rule 56(c) analysis, the Court looks to pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, for sufficient evidence that could convince a reasonable jury to find for Feinberg. The Court also resolves all uncertainties in favor of Feinberg. Before turning to the common law and RICO claims, therefore, the Court will delineate fully Feinberg's position and will point to the relevant submissions which purportedly substantiate his assertions.

Feinberg alleges the following. Products Union Garments, Limited ("Products Union") is a company owned by the Lam brothers, who also own Fashion Will. (Pl.'s Mem., Robert Feinberg Dep. at 6–10). Both Fashion Will and Products Union owed on loans outstanding to Central Asia. (Pl.'s Mem. Ex. 107, Ex. 150 ("Customer Line Enquiry" for Fashion Will (April 10, 1995) and Products Union (March 1, 1995) showing outstanding balances); Def.'s Supp. Mem. Ex. 11 (stating Customer Line Enquiry "lists out the outstandings [the amount drawn down from a particular facility] and exposures of the cus-

tomers")). Central Asia's General Manager, Alan Tang, described Fashion Will's financial instability on July 28, 1995, noting "the liquidity position for the group is rather tight;" in fact, Fashion Will requested that for two months, it might be able to keep for its business all proceeds from export bills. (Pl.'s Mem. Ex. 136; Def.'s Supp. Mem. Ex. 6 at 77). Central Asia grew concerned because while Fashion Will's liquidity tightened, the collateral securing Fashion Will's debt diminished in value. (Pl.'s Mem. Ex. 102 (message from Central Asia warning "the *collateral values to loan ratios are rather low* ranging from *40.0% to 68.9%* "); Def.'s Supp. Mem. Ex. 6 at 60–61, 68–69).

Fashion Will informed Feinberg initially that in order to deal with rising prices of cotton, it needed the red clause inserted into the letters of credit. (Pl.'s Mem. Exs. 10–11; Exs. 13–14). Feinberg agreed to insert the red clause, but included the requirement that Fashion Will submit an undertaking so as to insure that the red clause advances would only be used to purchase raw materials for Feinberg's finished garments. (Pl.'s Mem., Robert Feinberg Dep. at 175).

In connection with the April 10, 1995 red clause advance, Central Asia telexed Meridian, stating "THIS IS TO INF U THAT V HV TDY ADVANCED USD600,000 TO BENEF ACCORDING TO YR RED CLAUSE AUTHORIZATION AS STATED IN ABV CREDIT. FOR YR RECORD, V WL SEND U TODAY THE RELATIVE CERTIFIED TRUE COPIES OF BENEF'S DRAFTS N UNDERTAKING." (Pl.'s Mem. Ex. 114). Thereafter, Central Asia confirmed the telex with a letter dated April 10, 1995 stating "WE ENCLOSE HEREWITH THE CERTIFIED TRUE COPIES OF BENEFICIARIES DRAFTS AND UNDERTAKING [where Fashion Will certifies that 'THESE FUNDS WILL BE USED TO PURCHASE RAW MATERIAL OF FINISHED PRODUCTS TO ENABLE U.S. TO EFFECT SHIPMENTS OF LADIES WEARING APPAREL']." (Pl.'s Mem. Ex. 31 (dated April 10, 1995), Exs. 32–35, Ex. 46).

Fashion Will did *not*, however, use the advances in accordance with the undertaking's certification. Instead, Central Asia applied portions of each red clause advance to repay call loans owed to it by both Fashion Will and Products Union. Fashion Will, however, did not instruct Central Asia to make these applications. (*See* Pl.'s Mem. Ex. 107 ("Customer Line Enquiry" dated April 10, 1995 documenting $600,000 red clause advance with notation underneath stating "fully settled the 3 call loan ... balance transfer to a/c Products Union for call loan repayment"); Pl.'s Mem. Ex. 112 (Fashion Will's request to Central Asia for the red clause advance that left blank the "Other Instructions" column that would advise Central Asia what to do with the red clause advances); Pl.'s Mem. Ex. 113 (Central Asia Account Advice dated April 10, 1995 listing "[1] RED CLAUSE ADVANCE AMOUNT USD600,000 @ 7.729 HKD4,637,400," "[2] AMOUNT TRANSFERRED TO LOANS DEPT. HKD1,024,756.05," "[3] AMOUNT TRANSFERRED TO LOANS DEPARTMENT FOR A/C OF PRODUCTS UNION HKD3,612,643.95," and (4) balance to Fashion Will "NIL"); Pl.'s Mem., Alan Tang Dep. at 20, 31 (stating that none of the $600,000 was available on April 10, 1995 for Fashion Will to use in accordance with the undertaking; "if funds are transferred to the Loans Department at that point in time it is really to pay down the loans for the customers.... Instantly when the funds were transferred to Loans it would be used to pay down loans"); Def.'s Supp. Mem. Ex. 7 at 14–15 (deposition of Nancy Ho, Central Asia employee, stating that the notation "fully settle[d] 3 call loan" on the April 10, 1995 Customer Line Enquiry means that "a portion of the U.S. $600,000 was going to be used to pay down the three call loans")).

On the next day, April 11, 1995, Fashion Will received another call loan from Central Asia which it did not use to purchase raw materials to fill Feinberg's Order. Rather, Fashion Will used the proceeds of the call loan to repay Central Asia for a trust receipt that was due on March 24, 1995. Fashion Will then used the two red clause advances from July 21, 1995 to repay the April 11, 1995 call loan. (Pl.'s Exs. 32–33; Exs. 151–52; Ex. 107; Ex. 118; Arthur Lloyd Dep. at 33–37 (claiming Fashion Will requested the call loan on April 11, 1995, Central Asia granted the request, the July 21, 1995 red clauses furnished advances of USD56,280.00

and USD132,415.20, and Central Asia applied those advances to the April 11, 1995 call loan)). Fashion Will did not instruct Central Asia to apply the red clauses in this manner. (Pl.'s Mem. Exs. 116–17). Once again, Central Asia advised Meridian by telex and letter that the red clause advances had been made and enclosed Fashion Will's undertaking. (Pl.'s Mem. Ex. 32–33 (letter from Central Asia that states monies were advanced to Fashion Will and attaching certified copies of Fashion Will's undertaking that certifies that the funds were being used to purchase raw materials to effect the shipment of ladies' apparel)).

Fashion Will and Central Asia used a different approach with regard to the September 11, 1995 red clause advance totaling USD234,697.00. When Letter 1 (see supra) expired on September 10, 1995, Central Asia had not yet demanded repayment, and red clause advances had not yet been repaid. Central Asia thus placed USD160,234.07 in a "marginal deposit account" which it used as "some sort of security or as a deposit in case these loans or these advances are not settled. [Central Asia] use[s] this marginal deposit to settle it." (Pl.'s Mem., Alan Tang Dep. at 42). According to Alan Tang, Fashion Will could not access funds in this marginal deposit account. (Id. at 43). Nevertheless, on September 11, 1995, Central Asia sent Meridian the standard telex and accompanying letter confirming the telex. (Pl.'s Mem. Ex. 35 (letter confirming telex and stating "WE HAVE ADVANCED USD234,697.80 TO THE BENEFICIARY" and enclosing Fashion Will's usual certification "THAT THESE FUNDS WILL BE USED TO PURCHASE RAW MATERIAL OR FINISHED PRODUCTS TO ENABLE USE TO EFFECT SHIPMENTS OF LADIES APPAREL")).

On September 12, 1995, following the issuance of Letter 2 (see supra, which also contained a red clause), Central Asia supposedly made a red clause advance of USD186,119.51 to Fashion Will but instead actually used the red clause advance to repay the unpaid red clause advances from Letter 1. (Pl.'s Mem. Ex. 128 ("Customer Line Enquiry" instructing "release margin under AC69785 [Letter 1] to client. Utilise [sic] the new red clause advance to offset the existing red clause advance under AC–69785 and balance-release

to client"); Ex. 130 (Central Asia Account Advice listing red clause advance of USD186,119.51 and applying USD160,234.07 to "Red Clause Advance AC69785"); Alan Tang Dep. at 43 (corroborating this use of Letter 2's red clause advance)). Once again, Fashion Will did not instruct Central Asia to apply the red clause advances for this purpose. (Pl.'s Mem. Ex. 125; Ex. 129; Alan Tang Dep. at 43). As usual, Central Asia sent Meridian the standard telex and subsequent confirmation letter. (Pl.'s Mem. Ex. 43; Ex. 146).

In fact, Central Asia had been misapplying red clause advances since June, 1994. Specifically, on June 23, 1994, Central Asia used a red clause advance under a previous letter of credit to repay call loans owed by Fashion Will and Products Union. (Pl.'s Mem. Ex. 99 (Central Asia Account Advice for Fashion Will which lists "RED CLAUSE ADVANCE USD365,385.60 @ 7.7235 HK$2,822,055.68;" describes its application: "AMT. CREDITED TO YR DISBURSEMENT A/C WITH U.S. 4,300; AMOUNT REPAID LC23900–01 944,657.38; AMT. REPAID LR–13162 181,-789.68; AMT REPAID [FOUR LETTERS OF CREDIT] OF PRODUCTS UNION GARMENTS, LTD. 1,686,188.62;" and lists Fashion Will's balance: "NIL")). On July 12, 1994, Central Asia transferred another red clause advance under the same letter to its Loan Department. (Pl.'s Mem. Ex. 100 (Central Asia Account Advice for Fashion Will which lists "RED CLAUSE ADVANCE USD29,232.00 @ 7.72 HKD225,671.04" and reveals the destination of a portion of that amount: "AMOUNT TRANSFERRED TO LOANS DEPT TOTAL BALANCE HKD225,551.04")). On August 10, 1994, Central Asia once again appropriated red clause advances to Fashion Will's account. (Pl.'s Mem. Ex. 108 (Central Asia Account Advice notifying Fashion Will of the "AMOUNT CREDITED TO YOUR DISBURSEMENT A/C WITH US" taken from the red clause advance)). The same occurred on September 14, 1994, with respect to a red clause advance on another, earlier, letter of credit, which Central Asia transferred to the Loans Department to repay debts owed by Products Union. (Pl.'s Mem. Ex. 105 (Central Asia Account Advice revealing "Red

Clause Advance USD232,332.60 ... @ 7.7215 HKD1,746,727.93" and "Amount transferred to Loans Dept for repay Products Union Garments HKD1,746,607.93")). (*See also* Pl.'s Mem. Robert Feinberg Aff. ¶ 1 (averring "[i]n April, 1995, I was unaware, and Central Asia concealed from me, that under earlier Letters of Credit opened by Feinberg for the benefit of Fashion Will, Central Asia had misapplied red clause advances to repay itself for debt owed to it by Fashion Will and Products Union Garments Limited")).[6]

Finally, Central Asia's demands on Meridian for repayment of the red clause advances once again misrepresented the uses of those funds. Specifically, Central Asia claimed to have advanced Fashion Will the monies as authorized by the red clause when in reality the money was being used to pay down Fashion Will's and Products Union's debts. (Pl.'s Mem. Ex. 68 (asking "PLS REFUND U.S. THE ADVANCES PREVIOUSLY MADE BY USE TO THE BENEF PURSUANT TO THE RED CLAUSE IN THE LC"); Ex. 69 (same); Ex. 72 (claiming "AS AUTHORIZED BY THE RED CLAUSE FACILITY IN YOUR LETTER OF CREDIT, WE MADE THE ADVANCES REFERRED TO ABOVE UNDER YOUR L/C AGAINST PRESENTATION TO U.S. ON THE DATES REFERRED TO ABOVE OF FASHION WILL LIMITED'S SIGHT DRAFT ... [AND] WRITTEN UNDERTAKING"); Ex. 74 (the same)).[7]

### E. Common Law Claims

### 1. Fraud

Central Asia argues that Feinberg's fraud claim fails because Central Asia did not owe Feinberg, a party not in privity with Central Asia, any "duty." According to Central Asia, it was under no obligation to reject its customer's (Fashion Will's) instruction, to refuse to apply the credit as Fashion Will directed, or to monitor and supervise the intended uses of the advances.

Central Asia contends that Feinberg cannot offer evidence of the elements necessary to establish a *prima facie* case of common law fraud. Specifically, with respect to the misrepresentation element, Central Asia asserts that the statements supporting the fraud claim—"[W]E [FASHION WILL] HEREBY CERTIFY THAT THESE FUNDS WILL BE USED TO PURCHASE RAW MATERIAL OF FINISHED PRODUCTS TO ENABLE U.S. TO EFFECT SHIPMENTS OF LADIES WEARING APPAREL"—amount to nothing more than a misrepresentation of a future event. (*See* Pl.'s Mem. Exs. 31–35). Under Pennsylvania law, maintains Central Asia, a fraud claim must be predicated upon a present or pre-existing fact, not a future promise. *See Wood*, 888 F.2d at 319 (instructing district court to address, in a suit brought by a customer against a beneficiary, "whether the representations made by Donnelley upon which Wood bases his suit were promises to do future acts, and hence incapable of sustaining a claim for fraud, or whether they contained statements of existing facts that were untrue, which can be the basis for a fraud claim"). Feinberg, contends Central Asia, presents no evidence that Central Asia knew such statements were fraudulent when made.

Central Asia also denies that *it* was the source of the misrepresentations, claiming Fashion Will made the inaccurate statements

---

**6.** Feinberg alleges that as to these advances, "Central Asia followed its usual pattern of sending a telex, followed by a letter, to Meridian falsely asserting that an advance had been made that very day 'according to Meridian's instruction as stated in the above red clause.' " (Pl.'s Mem. at 61). Feinberg submits one letter dated September 14, 1994 referring to a telex sent the same day and including Fashion Will's undertaking. (*See* Pl.'s Mem. Ex. 106).

**7.** Feinberg's expert describes the events alleged as follows:

the bank made a statement to the opening bank, that it advanced the money to the beneficiary; the beneficiary made a statement in compliance with the terms and conditions of the credit that it was using the money—that we will use the money to purchase raw materials of finished products.

None of that happened. The bank knew it. The bank perpetrated in that because they used the money to pay off call loans, to use additional call loans to pay off trust receipts, and to recycle their type of facility into self-liquidating types of transactions to make their credit position easier....

(Pl.'s Mem., Arndt Dep. at 225–26).

and gave the documents to Central Asia, which then performed the ministerial act of forwarding the documents to Meridian. The telexes and letters sent from Central Asia to Meridian contained true statements: that Central Asia advanced monies to Fashion Will pursuant to the red clause. Central Asia did not vouch for the accuracy of Fashion Will's statements. (*See* Pl.'s Mem. Exs. 31–35 (letters from Central Asia to Meridian informing "THAT WE HAVE ADVANCED USD600,000.00 TO BENEFICIARY ACCORDING TO YOUR INSTRUCTION AS STATED IN THE ABOVE RED CLAUSE L/C. FOR YOUR RECORD, WE ENCLOSE HEREWITH THE CERTIFIED TRUE COPIES OF BENEFICIARY'S DRAFTS AND UNDERTAKING, THE ORIGINALS OF WHICH ARE BEING RETAINED BY US")).

Central Asia also avers its actions were not incongruous with the instructions contained in the red clause because the red clause neither restricted the issuance of advanced credit nor prohibited Fashion Will from applying the advances to its line of credit. (*See* Def.'s Supp. Mem. at 8 (claiming red clause did not "specify that the advance must be used specifically for the romper order, or any particular order at all. . . . [T]he funds can be used to effect the shipment of any order for ladies' wearing apparel")).

Finally, according to Central Asia, Feinberg cannot claim reliance because he was never the recipient of any misrepresentations from Central Asia. Central Asia never contacted Feinberg directly and dealt only with Meridian.

■ The Court rejects Central Asia's claim that it did not owe Feinberg, a party not in privity with Central Asia, any "duty." The Court cannot find, and Central Asia fails to supply, any cases that refused to impose a "duty" on a nominating bank that allegedly perpetrated fraud against the customer of a letter of credit. As mentioned *supra*, there is authority precluding customers from asserting causes of action against banks in the absence of privity. The Court notes, however, that *none* of those cases involved allegations of fraud, and their precedential value is limited to cases that proceed on negligence, contract, and warranty theories.[8]

The Court finds unpersuasive Central Asia's claim that Feinberg has not satisfactorily presented evidence to satisfy the *prima facie* elements of a fraud claim. *See e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.) (listing elements of fraud as "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage"), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (citation omitted).

■ First, the Court declines to accept Central Asia's assertion that Feinberg's claim is fatally predicated upon a misrepresentation of a future promise rather than a present or pre-existing fact. While fraud claims may not rest solely upon misrepresentations of future promises, it is equally true

---

**8.** *See Dibrell*, 38 F.3d at 1583 (treating fraud and civil RICO claims separately and mentioning lack of duty in breach of contract analysis); *Cenlin*, 5 F.3d at 357 (addressing warranty claim); *Confeccoes*, 994 F.2d at 853–55 (examining UCC violations, tort claims, and breach of warranty claims); *Sound*, 819 F.2d at 392 (noting that the potential beneficiary's "alleged injury was occasioned not by an affirmative act [of the advising bank,] but rather by its failure to advise"); *Auto Servicio*, 765 F.2d at 1308 (accepting the district court's reasons for refusing to expand the confirming bank's liability on a negligence theory); *Instituto*, 858 F.2d at 1267 (finding customer does not have cause of action for negligent misrepresentation against a confirming bank but *specifically limiting* its holding: "because Indeca . . . does little to argue fraud and recklessness, we likewise are not concerned with the jury's findings regarding recklessness or fraud. Therefore we will limit our discussion . . . to negligence, specifically the tort of negligent misrepresentation"); *Merchants*, 585 F.Supp. at 306–11 (disallowing contract and contribution claims brought by advising bank against issuing bank but allowing fraud and indemnity claims); *Carlson v. Branch Banking and Trust Co.*, 123 N.C.App. 306, 473 S.E.2d 631, 636 (1996) (noting "any duty on the part of a commercial lender to a guarantor to monitor the use of loan proceeds by a borrower must arise through contract;" where the contract did not contain a provision requiring monitoring of the loan proceeds, there was no legal duty to do so; "[i]n the absence of such a duty, there can be no claim for negligence"), *review denied*, 345 N.C. 340, 483 S.E.2d 162, (1997).

that "a cause of action for fraud can be predicated on future promises if the defendant knew at the time he made the promise that he would not carry it out." *Killian v. McCulloch,* 850 F.Supp. 1239, 1255 (E.D.Pa. 1994) (citation omitted). "[F]raud consists in [sic] anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 731 (3d Cir.1991) (citation omitted), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). Furthermore, "[f]alse information may be communicated directly, or indirectly by the non-disclosure of material facts. The deliberate non-disclosure of a material fact is the equivalent of the affirmation of a falsity, and an innocent misrepresentation is actionable if it pertains to a matter material to the transaction involved." *Fort Washington Resources, Inc. v. Tannen,* 858 F.Supp. 455, 459 (E.D.Pa.1994) (citations omitted).

 The record contains adequate evidence to create a genuine issue of material fact as to whether Central Asia made misrepresentations. With respect to the April 10, 1995 red clause advance, Feinberg presents evidence that Central Asia's telex to Meridian misrepresented the destination of the red clause advances, falsely stating that the funds had been sent to Fashion Will. Feinberg's proofs could suggest to a jury that, in reality, Fashion Will could not access the money because it was being used to pay down debts Fashion Will and Products Union owed Central Asia. This conduct, if proven, may constitute fraud if it was calculated to deceive Meridian concerning the destination of the red clause advances and Fashion Will's access to them.

Feinberg also presents evidence that Fashion Will's undertaking attached to Central Asia's subsequent letter to Meridian (dated April 11, 1995) deliberately concealed and misrepresented the true use of those funds, i.e. to pay down three call loans. Admittedly, the undertaking refers to acts Fashion Will was to perform in the future. Submitting those undertakings can constitute fraud, however, if Fashion Will knew, at the time they were submitted, that the certifications that the funds would be used to purchase ladies' apparel were false. Feinberg has submitted evidence that could convince a jury that Fashion Will knew, when it submitted the undertakings, that the undertakings falsely represented the destination and use of the red clause advances. In connection with the April, 1995 red clause advance, *all* the documents share the same date. Specifically, the following documents are all dated April 10, 1995: the (1) telex informing Meridian of the advance, (2) subsequent letter confirming the telex, (3) Customer Line Enquiry demonstrating that the advance was used to settle three call loans, and (4) Central Asia–Account Advice showing the application of the red clause money to the accounts of Fashion Will and Products Union. (*See* Pl.'s Mem. Ex. 114 (telex); Ex. 31 (subsequent letter); Ex. 107 (Customer Line Enquiry); Ex. 113 (Central Asia Account Advice)).

The same approach was taken with respect to the July 21, 1995 and September 11, 1995 advances. The telexes, accompanying letters, and undertakings submitted in conjunction therewith, may have created the impression that Central Asia advanced the red clause funds to Fashion Will, that the red clause funds were at Fashion Will's disposal, and that the red clauses were being used to effectuate the purchase of ladies' apparel to fill Feinberg's order. Feinberg's submissions could convince a jury that Central Asia (1) used the July 21, 1995 red clause advances to pay down Fashion Will's April 11, 1995 call loan; (2) placed the September 11, 1995 red clause advance in a marginal deposit account, beyond Fashion Will's reach; (3) used the September 12, 1995 red clause advance authorized by Letter 2 to repay the red clause advances Fashion Will had not yet repaid from Letter 1; and (4) misrepresented, when demanding reimbursement from Meridian, that the funds had been disbursed in accordance with the restrictions articulated in the red clause.

Additional factual questions emerge surrounding the purported misrepresentations, specifically whether it was Central Asia or Fashion Will who instructed that the funds be applied to pay down debts. According to Central Asia, Fashion Will orally ordered the

application of the red clause advances to pay down the call loans. (Def.'s Supp. Mem. Ex. 6 at 23–24 (revealing "it was Fashion Will ... who requested [and made the decision] that the funds ... went to the Loans Department")); Ex. 7 at 14–15 (referring to "oral instructions from Fashion Will"). Feinberg objects that the record contains no evidence that Fashion Will decided to misapply the red clause advances. Moreover, Feinberg points to documents from Fashion Will requesting the red clause advance that contain a provision for "Other Instructions" that Fashion Will left blank. Any request by Fashion Will to apply the red clause advances to outstanding loans, suggests Feinberg, would appear in that space. (Pl.'s Mem. Ex. 112; Exs. 116–17; Exs. 125–29). Furthermore, according to Feinberg, both Alan Tang and Andy Lam (owner of Fashion Will) admitted that Central Asia used the red clause advances to pay down Fashion Will's debt. Alan Tang, however, denies that accusation. (*Compare* Pl.'s Mem., Robert Feinberg Dep. at 252 (alleging "[Lam] indicated to me that the monies were used to pay off the indebtedness to the bank and not to buy fabric as represented by the undertakings. And Central Asia knew this also" and "I spoke to Tang and I asked him did they take the money to pay off the indebtedness and he said 'you could say that' ")), *with* (Def.'s Supp. Mem. Ex. 6 at 85 (deposition of Alan Tang who denies making such a statement)).

Finally, the record contains evidence of Feinberg's reliance. During his deposition, Robert Feinberg testified to receiving Central Asia's telexes and Fashion Will's undertakings from Meridian promptly after Meridian received them. Robert Feinberg also agreed to amend the letters of credit, extend times and dates, to open Letter 2, and to insert the red clauses in each letter of credit based upon the promises that the monies would be used to purchase raw materials. (Pl.'s Mem., Robert Feinberg Dep. at 16, 21; Robert Feinberg Aff. ¶¶ 1–4; Def.'s Supp. Mem. Ex. 5 at 14–15 (stating he received the documents promptly through Meridian, claiming reliance on the statement "[t]hat the monies would be used to buy fabric;" and noting "[h]ad I known ... of the misapplication of the red clause advances, I would not have authorized those amendments under [Letter 1] without having received adequate assurances .... [and] I would not have authorized amendment to [Letter 2] ... to include a red clause")).

Accordingly, the Court finds adequate evidence in the record to create a genuine issue of material fact as to whether Central Asia perpetrated fraud through misrepresentations and concealment, and whether Feinberg actually relied on those misrepresentations and non-disclosures.

**2. Conversion**

Central Asia argues that Feinberg cannot assert a claim for conversion because a customer to a letter of credit does not have an immediate and unconditional right to the funds under the letter of credit, a prerequisite to sustaining a cause of action for conversion. Central Asia cites *Union Pac. R.R. Co. v. The Village of South Barrington*, 958 F.Supp. 1285 (N.D.Ill.1997), where the court granted a motion to dismiss a conversion claim asserted by a customer against the beneficiary of a stand-by letter of credit that drew on the letter of credit. The court found:

> a standard letter of credit transaction involves three separate and independent contracts. A beneficiary (the Village) may receive letter of credit-funds upon the presentation of proper documents to the issuer (the Bank). The customer (plaintiff) may challenge any payment made by the issuer to the beneficiary at a later date. The customer does not have an immediate and unconditional right to the letter of credit funds. Accordingly, [the conversion claim fails].

*Id.* at 1297–98 (citations omitted). Feinberg asserts Central Asia converted the red clause advances which were specifically dedicated for a particular purpose, to purchase raw materials to be incorporated into garments ordered by Feinberg. According to Feinberg, Central Asia had no entitlement to those funds but nonetheless exercised control over them and asserted a right to them adverse to Feinberg, depriving him of both the monies and the garments.

The Court agrees with Central Asia. Pennsylvania law defines "conversion"

as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Schulze v. Legg Mason Wood Walker, Inc.*, 865 F.Supp. 277, 284 (W.D.Pa.1994) (citation omitted). The plaintiff may bring suit "if he or she had either actual or constructive possession, or an immediate right to possession of the chattel at the time of conversion." *Eisenhauer v. Clock Towers Assocs.*, 399 Pa.Super. 238, 582 A.2d 33, 36 (1990) (citation omitted). In the absence of actual or constructive possession, the rights to possession must be immediate. *See Peoples Mortgage Co., Inc. v. Federal Nat'l Mortgage Ass'n*, 856 F.Supp. 910, 928 (E.D.Pa.1994) (noting "[t]he party claiming conversion must have had an immediate right to possession of the property at the time it was allegedly converted") (citation omitted); *Eisenhauer*, 582 A.2d at 36 (referring to Restatement (Second) of Torts § 225 (1965) which provides: "[f]or conversion the actor is subject to liability to one who at the time was entitled to immediate possession of the chattel"); *Bank of Landisburg v. Burruss*, 362 Pa.Super. 317, 524 A.2d 896, 898 (1987) (noting "plaintiff may bring suit [for conversion] if he had an immediate right to possession of the chattel at the time it was converted") (citation omitted).

■ Pennsylvania courts disallow conversion claims where an immediate right to possession is lacking. Specifically, an action for conversion will not lie where the alleged converter (1) borrowed money, (2) collected money to satisfy a debt, (3) refused to return proceeds already paid under an insurance contract, or (4) refused to pay the proceeds of an insurance policy. *See Corporate Plaza Partners, Ltd. v. American Employer's Ins. Co.*, No. 95–5234, 1996 WL 180696, at \*2 (E.D.Pa. Apr.3, 1996) (granting 12(b)(6) motion to dismiss insurance company's conversion claim to retrieve money it voluntarily advanced to an insured because the insurance company "no longer had an immediate right of possession" to the money); *Montgomery v. Federal Ins. Co.*, 836 F.Supp. 292, 300–01 (E.D.Pa.1993) (recognizing that "an action for conversion will not lie where an alleged converter borrowed money, even though he had an intent not to pay back the loan .... [or] when the money is collected to satisfy a debt" and disallowing plaintiff's conversion claim based upon "defendants' refusal to pay proceeds on plaintiff's claim under the insurance contract") (citations omitted). These decisions refused conversion claims because they felt that the true remedy for the harm alleged lay in contract and not in tort. An alternative result would blur the line between contract and tort:

> [w]hile it is true that the mere existence of a contract between parties does not foreclose the possibility of a tort action arising between them, it does not follow that a plaintiff should be allowed to sue in tort for damages arising out of a breach of contract. To hold otherwise would be to blur one reasonably bright line between contract and tort, and hence introduce needless confusion into the judicial process, a step that Pennsylvania state and federal courts have refused to take.

*Peoples*, 856 F.Supp. at 929 (citation omitted).

■ Although the letter of credit assures the availability of money to the beneficiary, the customer has no immediate right to the possession of such money. While Feinberg can challenge the disposition of the letter of credit payments, he certainly has no right to possess or draw down letter of credit funds. The tort of conversion, which relates to property rather than contract rights, is an inappropriate remedy to the customer for misuse or misapplication of letter of credit funds under the law of Pennsylvania. The Court finds similar the aforementioned cases involving loan repayment and the collection of insurance proceeds, cases also marked by the absence of a right to immediate possession.

Finally, the Court considers *Union* instructive. Like Pennsylvania law, Illinois law requires immediate possessory rights to sustain a conversion claim. *See Union*, 958 F.Supp. at 1297–98 (listing elements of conversion claim as including, *inter alia*, "plaintiff's right to immediate possession of property, absolute and unconditionally") (citation omitted). *Union* also recognizes that the possessory right held by a customer is not immediate and cannot provide a basis for an action for conversion. Accordingly, the Court will grant Central Asia's Motion for

Summary Judgment with respect to Feinberg's conversion claim.

### 3. Civil Conspiracy

Central Asia moves for summary judgment with respect to Feinberg's common law civil conspiracy claim, but makes no supporting argument in its briefing.[9] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) states that the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, –together with the affidavits, if any,' which it believes demonstrate the absence of any genuine issue of material fact." In the absence of argument pertaining to civil conspiracy, the Court declines to entertain Central Asia's Motion for Summary Judgment as it relates to the common law civil conspiracy claim.

### 4. Tortious Inducement (Interference With Contractual Relations)

According to Central Asia, the tortious inducement claim fails because the record contains no evidence of Central Asia's intent to harm Feinberg. Even if Feinberg's allegations are true, argues Central Asia, a bank's request to its customers to pay down debts does not rise to the level of "intending harm." Feinberg suggests that Central Asia's intent can be deduced from its knowledge that the red clause advances were needed by Fashion Will to purchase raw materials, that Fashion Will was in poor economic health, that the funds were not used to purchase raw materials, and that direct harm would result to Feinberg from misappropriation of the funds.

■■■■■ In Pennsylvania, a cause of action for intentional interference with contractual relations contains four elements: "(1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct." *Triffin v. Janssen,* 426 Pa.Super. 57, 626 A.2d 571, 574 (1993) (citation omitted). Intent may be shown "where the actor knows an injury is certain or substantially certain to occur as a result of his action." *Total Care Sys., Inc. v. Coons,* 860 F.Supp. 236, 241 (E.D.Pa.1994) (citations omitted).

■■■■■ The record in the instant case contains sufficient evidence to create a jury issue as to whether Central Asia tortiously interfered with the contractual relationship between Feinberg and Fashion Will. There is evidence that suggests a contractual relationship between Feinberg and Fashion Will, the usurpation of funds destined for Fashion Will without justification, and damages resulting from misapplication of the funds. With respect to intent, a jury could conclude that Central Asia possessed sufficient knowledge that its actions would produce damaging consequences to Feinberg. Feinberg presents evidence that Central Asia knew (1) of Fashion Will's precarious financial condition; (2) that Feinberg required Fashion Will's certifications to assure the funds reached their anticipated destination; and (3) that placing the funds beyond Fashion Will's reach would frustrate Fashion Will's ability to fill Feinberg's order, and thereby harm Feinberg. Accordingly, the Court will allow Feinberg's tortious interference claim to proceed.

### 5. Negligent Misrepresentation

■■■■■ Central Asia claims Feinberg's negligent misrepresentation claim fails because it did not owe Feinberg either a statutory or common law duty of care. The Court agrees. While the Court declined to accept Central Asia's argument that, in the context of fraud, a nominating bank does not owe a customer a "duty," the Court finds ample support for Central Asia's position that a nominating bank, with whom Feinberg was not in privity and with whom Feinberg had virtually no

---

9. Central Asia does mention the common law civil conspiracy claim in the portion of its brief dedicated to Feinberg's claim of conspiracy under 18 U.S.C.A. § 1962(d) (RICO conspiracy). (*See* Def.'s Supp. Mem. at 22 (noting "[p]laintiff has alleged that Central Asia conspired with

Fashion Will acting in concert to harm the plaintiff. (Plaintiff's Complaint, Count IV [civil conspiracy]). Plaintiff has also alleged, under Count V, that Central Asia violated § 1962(d)")). That discussion, however, focuses only on conspiracy in the context of a civil RICO claim.

contact (except through Meridian), does not owe the letter of credit's customer a duty of care under a negligence theory. *See Dibrell,* 38 F.3d at 1580 (stating "because of a lack of privity between the confirming bank and the customer, the confirming bank has no right of reimbursement against the original customer and owes that customer no duty"); *Confeccoes,* 994 F.2d at 853 (remarking "the *only* duty owed by a confirming bank is to *its* customer, the issuing bank") (citation omitted); *Sound,* 819 F.2d at 391 (holding advising bank does not owe potential beneficiary tort duty of timely transmission); *Auto Servicio,* 765 F.2d at 1308 (noting that on a negligence theory, the advising / confirming / paying bank only owes a statutory duty of care to its customer, the issuing bank); *Instituto,* 858 F.2d at 1270 (finding customer does not have cause of action for negligent misrepresentation where "there is no Illinois case applying the tort of negligent misrepresentation to a letter of credit or analogous transaction, and Article 5 does not suggest such a cause of action is appropriate here").

Accordingly, in light of authority refusing to impose a duty of care on advising, paying, and confirming banks, the Court will grant Central Asia's Motion for Summary Judgment with respect to Feinberg's claim for negligent misrepresentation.

## F. RICO

Feinberg's RICO claim alleges violations of 18 U.S.C.A. §§ 1962(a) and 1962(d). 18 U.S.C.A. § 1962(a) provides, in part:

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or establishment or operation of, any enterprise which is engaged in, or the activities

of which affect, interstate or foreign commerce.

18 U.S.C.A. § 1962(d) makes it unlawful for any person to conspire to violate either §§ 1962(a), (b), or (c). The pattern of racketeering alleged by Feinberg refers to violations of 18 U.S.C.A. §§ 1341 ("Frauds and swindles") and 1343 ("Fraud by wire, radio, or television") (West Supp.1997). (*See* Compl. § 72).

RICO essentially involves the conduct of an enterprise through a pattern of racketeering activity. *See e.g., Heintz Corp. v. Electro Methods, Inc.,* No. 94–6916, 1995 WL 405721, at *2 (E.D.Pa. June 20, 1995) (noting that a RICO claim must allege "(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity") (citation omitted). RICO "defines a 'pattern' of racketeering activity as requiring at least two acts of racketeering activity within a ten year period." *Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.1995) (quoting 18 U.S.C.A. § 1961(5)), *cert. denied,* 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995).[10] The racketeering predicates must (1) be related and (2) amount to or pose a threat of continued criminal activity. Under the "relatedness requirement," "predicate acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 1292 (citation omitted).

The "continuity" prong of the analysis requires "continuity of racketeering activity, or its threat.'" *Id.* (citation omitted). Continuity may be either closed-ended, referring "to a closed period of repeated conduct," or open-ended, meaning "past conduct that by its nature projects into the future with a threat of repetition." *Id.* (citation omitted). With regard to closed-ended conduct, the related predicates must extend over a substantial period of time, generally exceeding one year. *Id.* at 1293.[11] "[O]pen-ended con-

10. The Court notes that *Tabas* was the product of a divided United States Court of Appeals for the Third Circuit. This section of Judge Roth's opinion was not joined by a majority of the court. Instead, Judge Becker—joined by Judge Stapleton and Judge McKee—and Judge Alito filed concurring opinions. Judge Greenberg, joined

by five other judges, dissented. However, to the extent the discussion is drawn directly from Supreme Court precedent, the concurring judges did not disagree with the analysis.

11. The period which must be alleged is unclear. Judge Roth's opinion refers to a period in excess

tinuity is established when the commission of the predicate acts is a 'regular way of conducting defendant's ongoing legitimate business or of conducting or participating in an ongoing and legitimate RICO enterprise.'" *Id.* at 1295 (citation omitted). *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36 (3d Cir.1987), however, recognized that:

> the existence of a RICO pattern does not turn on the abstract characterization of racketeering acts as 'continuous' and 'related' but rather on a combination of specific factors such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity.

*Id.* at 39.[12]

Central Asia argues that the record does not contain evidence of a pattern of racketeering activity. According to Central Asia, Feinberg has not furnished sufficient evidence to satisfy the continuity prong because the activity at issue did not extend over a substantial period of time generally exceeding one year, citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir.) (noting "[w]hen mail fraud is alleged as constituting the predicate acts, the number of mailings becomes less important in establishing a pattern of racketeering activity. The quantity of otherwise innocent mailings cannot itself transform defendants alleged fraud into a RICO pattern"), *cert. denied*, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *BML Group, Inc. v. U.S. Pizza, Inc.*, No. 88–7463, 1992 WL 220946, at *2 (E.D.Pa. Aug.31, 1992) (granting summary judgment on a RICO claim where "plaintiffs have produced evidence only of what is essentially a single alleged scheme that took place over a

period of no more than a year with a single group of victims"). Central Asia adopts the position that the purported scheme lasted only five months, from April, 1995 until September, 1995, and affected only one victim.

Central Asia protests that Feinberg has failed to allege that the "enterprise," Central Asia, was acquired, established, or operated through the use of illegal activities or by money obtained from illegal activities. According to Central Asia, its employees deny such activity. (*See* Def.'s Supp. Mem. Ex. 5 (deposition of Alan Tang denying that "Central Asia ever [made] a proposal to Fashion Will or Products Union that they obtain an increase in a Letter of Credit that would be available so the amount outstanding could be reduced")).

Central Asia disputes Feinberg's proofs with respect to investment injury, i.e., injury resulting specifically from Central Asia's investment of the funds in the enterprise. According to Central Asia, "Feinberg intended to loan credit to Fashion Will. Central Asia made the credit available and has not been paid back. Central Asia is the party who has been injured." (Def.'s Supp. Mem. at 20). Central Asia further asserts that "Fashion Will's instruction to credit its line of credit account, which had the effect of paying off old loans in order to open new loans, deprived Central Asia of income because Fashion Will avoided the payment of penalty charges to Central Asia." (Def.'s Supp. Mem. at 20).

Feinberg's inability to allege and prove fraud, maintains Central Asia, precludes him from proving violations of mail and wire fraud statutes. Specifically, the mailings occurred after Feinberg's decision to open the red clause credits, and he did not rely on

---

of one year, while Judge Becker's concurring opinion refers to a period in excess of three or four months, *Tabas*, 47 F.3d at 1300 (Becker, J., concurring). Judge Alito does not specify the period necessary to establish continuity. *Id.* at 1302 (Alito, J., concurring).

12. The viability of *Barticheck* is uncertain in the wake of *Tabas*. *See Tabas*, 47 F.3d at 1296 & n. 21 (noting "the fact that we do not employ the *Barticheck* factors in our analysis here does not, however, mean that they might not be relevant in a different case in determining if continuity ex-

ists ... [and they are] still relevant in determining whether a pattern exists"); *id.* at 1298–99 (Becker J., concurring) (considering the third, fourth, and fifth *Barticheck* factors irrelevant to the continuity inquiry); *id.* at 1302 (Alito, J., concurring) (remarking "the *Barticheck* factors should [not] be considered except to the extent that they have some logical bearing on 'relatedness' or 'continuity'"); *id.* at 1304–05 (Greenberg, J., dissenting) (finding the *Barticheck* factors provide "guidelines in determining whether the plaintiff has demonstrated continuity and relatedness").

those mailings. Fraud cannot exist when Central Asia did not owe any duty to Feinberg and when the fraudulent statements amounted to nothing more than future promises. Central Asia's final contention regarding Feinberg's RICO claim involves the quantum of proof necessary to show conspiracy. According to Central Asia, Feinberg has not furnished allegations addressing the period, object, and actions of the conspiracy and cannot prove any facts demonstrating an agreement between Central Asia and Fashion Will to commit mail fraud. (*See* Def.'s Supp. Mem. Ex. 6 at 98).

## 1. RICO Analysis

### (a). Predicate Acts

■ The Court begins by assessing record evidence of "predicate acts." With respect to mail fraud, 18 U.S.C.A. § 1341 "prohibits any person from knowingly causing the use of the mails for the purpose of executing any scheme or artifice to defraud. The actual violation is the mailing, although the mailing must relate to the underlying fraudulent scheme." *Kehr Packages*, 926 F.2d at 1413 (citations omitted). To demonstrate wire fraud, Feinberg must present proof (1) that Central Asia devised or intended to devise (2) a "scheme or artifice to defraud, (3) the use of . . . wires for the purpose of executing or attempting to execute the scheme or artifice, and (4) knowledge by [Central Asia] of that use." *Philadelphia Reserve Supply Co. v. Nowalk & Assocs., Inc.*, 864 F.Supp. 1456, 1470 (E.D.Pa.1994) (citation omitted).

■ In order to become a party to the execution of fraud, "the use of mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989) (citations omitted). "This holding is also applicable to wire communications." *Philadelphia Reserve*, 864 F.Supp. at 1470 (citing *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98

L.Ed.2d 275 (1987) (finding "the mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses")).

■ The record in the instant case contains sufficient evidence to convince a jury of the existence of predicate acts. The submissions suggest that Central Asia misrepresented to both Meridian and Feinberg the destination and use of the red clause funds and used wires (telexes) and mails (subsequent letters confirming those telexes) to effectuate that objective. A jury could find that the use of these instrumentalities played a significant role in the execution of a scheme by Central Asia and Fashion Will to fraudulently induce Feinberg to insert red clause advances into Meridian's letters of credit and then use those funds to repay loans. A jury could find that each time Central Asia told Meridian by wire and mail that it had made those funds available to Fashion Will (and attached Fashion Will's undertakings thereto) it committed predicate acts.

### (b). Continuity

■ The Court finds unpersuasive Central Asia's claim that Feinberg fails to satisfy the continuity prong of the predicate act analysis. The record contains submissions documenting Central Asia's perpetration of the alleged predicate acts, including seven telexes spanning from April 10, 1995 through March 11, 1996 and eight letters ranging from September 11, 1994 through September 15, 1995.[13] The record contains evidence that the predicate acts were perpetrated over a sufficient period of time—in excess of one year. Furthermore, even if the scheme did injure only one victim, that will not preclude the finding of a pattern of racketeering activity. *See Tabas*, 47 F.3d at 1306 (remarking "[w]hile is true that the presence of only one victim, like the existence of only one scheme, does not necessarily preclude the finding of a RICO pattern, this fact clearly weighs

13. (*See* Pl.'s Mem. Ex. 114 (telex dated April 10, 1995); Ex. 127 (telex dated September 11, 1995); Ex. 143 (telex dated September 14, 1995); Ex. 68 (telex dated December 1, 1995); Ex. 69 (same); Ex. 72 (telex dated March 11, 1996); Ex. 74 (same); Ex. 106 (letter dated September 14, 1994); Ex. 31 (letter dated April 10, 1995), Ex. 32 (letter dated July 21, 1995); Ex. 33 (letter dated July 21, 1995); Ex. 34 (letter dated July 25, 1995); Ex. 35 (letter dated September 11, 1995); Ex. 46, Ex. 131 (letter dated September 14, 1995)).

against the finding of continuity") (Greenberg, J., dissenting).

#### (c). "Enterprise"

 Central Asia can constitute an "enterprise" within 18 U.S.C.A. § 1962(a). While under 18 U.S.C.A. § 1962(c), "a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient," *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 268 (3d Cir.1995), this distinctiveness requirement does not apply to cases, like this one, where violations of 18 U.S.C.A. § 1962(a) are alleged. *See Kehr Packages*, 926 F.2d at 1411 (noting "while an entity can be both an enterprise and a defendant for purposes of § 1962(a), such a dual role is impermissible in actions based on § 1962(c)") (citing *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir.1990)).

The record contains genuine issues of material fact with respect to whether Central Asia received the red clause money from a pattern of racketeering activity—involving mail and wire fraud—and used those funds in its operations. Central Asia denies these allegations and Feinberg's case rests on such a theory. (*Compare* Def.'s Supp. Mem. Ex. 5 (deposition of Alan Tang denying that "Central Asia ever [made] a proposal to Fashion Will or Products Union that they obtain an increase in a Letter of Credit that would be available so the amount outstanding could be reduced"), *with* Pl.'s Mem., Arndt Dep. at 225–26 (averring Central Asia "used the [red clause advances] to pay off call loans, to use additional call loans to pay off trust receipts, and to recycle their type of facility into self-liquidating types of transactions to make their credit position easier")).

#### (d). Injury

 "Under § 1962(a), a plaintiff must allege injury specifically from the use or investment of income in the named enterprise." *Kehr Packages*, 926 F.2d at 1411 (citation omitted). Feinberg's submissions could convince a jury that red clause advances were used by Central Asia to pay off debt owed by Fashion Will and Products Union to Central Asia. Use of the allegedly misappropriated advances in this manner could constitute an investment by Central Asia in its own operations. *See Crowe v.*

*Henry*, 43 F.3d 198, 203 (5th Cir.1995) (finding sufficient allegations of injury where Crowe claimed "[f]unds that he owned that were allegedly fraudulently taken ... were invested into the enterprise and used to reduce the indebtedness on land that Crowe alleges was taken from him through a pattern of racketeering activity"). A jury could also find that this supposed misapplication of the funds prevented Fashion Will from purchasing raw materials and therefore filling Feinberg's order. Feinberg purportedly lost his investment.

Moreover, Feinberg contends, with substantiating submissions, that "Central Asia attempted to convert what were unsecured or under secured loans into loans secured by the credit of Meridian and ultimately Feinberg. As a consequence ... Central Asia materially reduced its own exposure to Fashion Will and [Products Union] during a year when it was assigning more and more debt to the uncollectible or doubtful category." (Pl.'s Mem. at 64 (referring to Exs. 146–47; Ex. 174)).

#### (e). Fraud

Central Asia's arguments with respect to Feinberg's inability to prove mail fraud—specifically lack of duty, statement only of a future promise, and no reliance—fail for the same reasons articulated *supra* in the analysis of the common law fraud claim. *See also Tabas*, 47 F.3d at 1290 n. 15, 1294 n. 18 (remarking that 18 U.S.C.A. § 1341 reaches "beyond the common law definition of false pretenses to encompass everything designed to defraud by representations as to past or present, or suggestions and promises as to the future.... [C]ompletely innocent mailings can satisfy the mailing element") (citation omitted).

#### (f). Conspiracy

 Finally, regarding conspiracy, the record contains evidence that could support a jury's finding that a conspiracy existed between Central Asia and Fashion Will lasting from June, 1994 through September, 1995 to misapply fraudulently obtained advances to Fashion Will's accounts in an effort to reduce debts owed by both Fashion Will and Prod-

ucts Union. *See Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989) (requiring adequately pled conspiracy claim to present allegations delineating "the period of the conspiracy, the object of the conspiracy ... the certain actions of the alleged conspirators taken to achieve that purpose .... agreement to commit predicate acts[,] and knowledge that the acts were part of a pattern of racketeering activity") (citation omitted). Central Asia's denial of such a conspiracy creates genuine issues of material fact as to whether it existed. (*See* Def.'s Supp. Mem. Ex. 6 at 98 (deposition of Alan Tang denying these allegations)). According to Feinberg, at the same time that Central Asia grew concerned about the economic viability of Fashion Will and Products Union, Fashion Will told Feinberg it needed the red clause advances to combat the higher prices of cotton. Exactly who suggested the red clause advances as a way to obtain money remains an open question. (*Compare* Def.'s Supp. Mem. Ex. 6 at 23–24 (alleging "it was Fashion Will ... who requested [and made the decision] that the funds ... went to the Loans Department"), *and* Ex. 7 at 14–15 (referring to "oral instructions from Fashion Will"), *and* (Pl.'s Mem. Ex. 14) (facsimile from Fashion Will to Feinberg asking "could u help to ask Debbie to rush out the amendment of Red Clause L/C to us"), *with* Pl.'s Mem. Ex. 112; Exs. 116–17; Exs. 125–29 (documents from Fashion Will requesting the red clause advance that left blank the "Other Instructions" provision)).

Accordingly, Feinberg's RICO claim will proceed.

**IV. Conclusion**

Article 5 does not include a definition of the functions performed by Central Asia and is completely silent as to the red clauses. Neither Article 5 nor "letter of credit" law apply, and the displacement provisions of Article 5 grant Feinberg license to pursue his common law claims. All of those claims, with the exception of conversion and negligent misrepresentation, will proceed to trial. The same can be said for Feinberg's RICO claim. The Court notes that Feinberg has filed a cross-motion for summary judgment. The same genuine issues of material fact that defeated Central Asia's Motion, however, preclude the Court from granting Feinberg's Motion.

An appropriate Order follows.

**ORDER**

**AND NOW**, this 1st day of May, 1997, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 33), Defendants' (Doc. No. 55), Plaintiff's Supplemental Memorandum (Doc. No. 56), and a hearing held on April 8, 1997 (Doc. Nos.57, 58), **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motions will be **GRANTED IN PART** and **DENIED IN PART.**

 (a). Defendants' Motions are **GRANTED** with respect to Count II ("conversion"); Count III ("fraud in the transaction"); and Count VI ("negligent misrepresentation").

 (b). Defendants' Motions are **DENIED** in all other respects.

2. Plaintiff's Cross–Motion is **DENIED.**